[Civ. No. 401. Fifth Dist. Apr. 20, 1965.]

LESTER L. CARRUTH, Plaintiff and Respondent, v. CITY OF MADERA, Defendant and Appellant.

Axel E. Christiansen, City Attorney, for Defendant and Appellant.

Charles F. Hamlin and Kimble, MacMichael & Runner for Plaintiff and Respondent.

STONE, J.—The City of Madera appeals from a judgment for the estimated cost of installing water mains, sewer mains and other facilities in plaintiff's subdivision property.

During the year 1946 plaintiff's predecessor in interest, W. S. Rogers, purchased 40 acres of land contiguous to but outside the city limits of the City of Madera. Rogers, wishing to have the property annexed to the city, discussed subdivision requirements for annexation with the Madera City Council. He was informed that the city would, at its expense, install water mains and sewers and pave the streets and alleys upon approval of a subdivision plan and annexation of the property. The city specified that the facilities would be installed only as construction progressed.

Late in 1946, Rogers presented a subdivision map to the city, which was rejected, but in 1947 he submitted a map and subdivision plan which the city approved, and the property was annexed. Rogers, in 1947, sold one-half of the subdivided property to H. P. Gunderson, who commenced improving his 20-acre parcel with houses. As to that one-half of the subdivision, the facilities were installed, the last during the year 1954.

In 1953, Rogers sold his one-half of the unimproved subdivision to one Parkes who, in 1956, sold to plaintiff herein subject to a note secured by a deed of trust in favor of Rogers. Early in 1960 plaintiff notified the city that he was commencing construction of houses on the portion of the subdivision owned by him and demanded that the city install water and sewer mains to serve his lots. The city refused his demand, and on August 8, 1961, plaintiff filed a formal claim against the city for damages he assertedly suffered by reason of the city's repudiation of the agreement.

The minutes of the Madera City Council reflect no formal council action in regard to the subdivision, other than approval of the subdivision map. The trial court, over city's objec-

tion, permitted parol proof of the agreement. Rogers, the original subdivider, testified that the agreement was made during two or more council meetings and that all of the councilmen agreed that if he, Rogers, would comply with the subdivision requirements of the city, as houses were built and the need arose the city would install the facilities. Rogers, of course, knew nothing about whether the proceedings were entered in the minutes of the city council. The mayor of the City of Madera at the time the subdivision was approved, testified to the agreement in more detail than did Rogers. The city records reflect that the city installed facilities in the subdivision from time to time, the last during the year 1954.

On the other hand, the conveyances from Rogers down to plaintiff make no reference to the agreement between Rogers and the city. Over city's objection, the trial court received testimony of oral assignments of the agreement in each instance of conveyance beginning with Rogers.

■ Taking up, first, the agreement between the city and Rogers, city argues that since the minutes of the city council do not reflect that city and Rogers entered into an agreement, there is no enforceable contract. Cases are cited to support this position, but analysis reveals that these cases are premised upon charter provisions or general laws prohibiting municipalities from entering into contracts other than by ordinance or by resolution duly recorded in council records. No charter is involved here, since Madera is a general law city, and no statute has been cited providing that validity of a city contract depends upon its recordation in council minutes. Therefore we conclude that proof by parol evidence is permissible. This accords with the general rule stated in 5 McQuillin, Municipal Corporations, section 14.08, pages 27-28, that:

"While the decisions present some apparent conflict respecting collateral impeachment of records of public or quasi-public corporations which are required by express law to be kept in writing, they are reasonably uniform in admitting parol evidence to establish the real facts of transactions or corporate acts, in the entire absence of all record, or where the record kept is so meager that the particular transaction, act, or vote is not disclosed by it. This principle has been adopted in order to preserve the rights of creditors of the corporation or third persons who have performed work or services or expended money for the benefit of the corporation, relying in good faith upon the regularity and legality of the proceedings."

City contends that we should construe Government Code section 36814, the substance of which was embodied in the Municipal Corporation Act applicable at the time, as limiting a city's liability to contracts appearing in the council records. This section provides: "The board shall cause the clerk to keep a correct journal of its proceedings. At the request of a member, it shall cause the ayes and noes to be entered on the journal."

This statute is directory only; it is not conclusive as to the proceedings of a city council and it does not restrict proof of contracts to the minutes of the council meetings nor prevent the introduction of evidence that the minutes do not reflect all of the proceedings of the council.

Appellant also cites the presumptions set forth in Code of Civil Procedure section 1963, subdivisions 15, 20 and 33: "That official duty has been regularly performed; . . . That the ordinary course of business has been followed; . . . That the law has been obeyed; . . ."

But these presumptions are made disputable by section 1963 itself, and the trial court was satisfied the presumptions were overcome by the weight of the evidence. Rogers, the original subdivider, testified to the terms of the contract and the circumstances surrounding its consummation. If his testimony is open to question on the ground of interest, it is supported, in fact considerably strengthened, by Mr. Gordon, the mayor of the city when the agreement was made. Gordon's testimony, pertinent to this issue, is that: "Well, Mr. Rogers was interested in purchasing this forty acres, the Meikle Tract, two twenty-acre tracts. The Meikle Tract was a twenty-acre subdivision. At that time we were interested in getting more lots in Madera. There was quite a building boom after the War. Lincoln Park had started, and Mr. Rogers wanted to get this subdivision going, he and Mr. Gunderson. Gunderson is the one I recollect more about than I do Mr. Rogers, because Mr. Rogers was connected with the flying field out here at the time. He was in charge of it. And the City really needed the lots, because there was quite a building boom. Many young people wanted to build, and there was just a shortage of lots. In fact, the City couldn't hardly keep up with putting in water lines and sewer lines to the property. We did make this rule, though. We would not lay any water or sewer lines until construction started. In other words, we didn't want to bury a lot of pipe, and then have them change their mind. So we would agree that when they started

construction we would get our City equipment—I think we hired a man with a digging machine, but we used mostly City employees. Our Water Department and Street Department handled the laying of the pipes. The City didn't contract it out. The City had its own men and its own equipment except for the digging machines, the machines that dug the trenches. We hired them to do it.

"MR. HAMLIN : Q. Was there any discussion that you recall between Mr. Rogers and the City Council as to what his intentions were about the property, and what he would do and what the City would do? "A. Yes. He wanted to subdivide it and have streets put in and get it in shape, so he could start to build houses on it. That was the sum and substance of it.

"Q. Did he ask if the City would do anything? A. Yes, he did.

"Q. What was the response? A. The City Council were willing to go along with the subdividers—not only with Rogers —but we did on Lincoln Park, which was the first one, and then other subdividers. We required them to come into the City, because that way the City assessments and all of our rules would apply, and we agreed we would help them out by laying the water and sewer lines, because we got more customers in this way, because they had to pay the water rent and the sewer rent to the City. But we did agree that we would not put any in there until the houses were ready to hook on. I recollect that, because lots of subdividers wanted us to lay the water and sewer lines, and they would be buried in the ground doing nobody any good. We didn't want to do it until they were ready to be used."

This testimony is corroborated by a letter written in 1950 by the man who succeeded Gordon as mayor. ▮ The letter, written at the request of H. P. Gunderson to whom Rogers in 1947 conveyed one-half of the 40-acre tract, is a business record dated May 10, 1950, addressed to a government official, the Real Estate Commissioner of the State of California. It reads, in pertinent part: "At the request of H. P. Gunderson, you are hereby advised that the City of Madera will provide and install domestic water distribution facilities, fire mains, and sewer collection mains within the above subdivision in accordance with the prevailing standards of the City of Madera, as and when required by the construction of homes and residences within said subdivision."

The letter does not prove execution of the Rogers agreement, as city points out, but it was admissible, nevertheless, as an

official or business record relevant to the issue. (Witkin, Cal. Evidence, § 111 et seq.) The question was not whether the letter was admissible in evidence, but the weight the trial court should give it as corroborating evidence.

Next, argues city, if a contract was proved, it is invalid because: first, it deprives successor councils of the right or power to determine city policy and public need in the annexation of subdivision property; second, the time of performance is indefinite; third, it violates a statute effective in 1946-1947 requiring any installation of facilities of the type here involved that exceeds $1,000 to be done by contract let to the lowest bidder; fourth, the agreement violates the debt limitations of article XI, section 18, of the Constitution.

 Considering these contentions seriatim, first, the law is clear that a city has authority to enter into contracts which enable it to carry out its necessary functions, and this applies to powers expressly conferred upon a municipality and to powers implied by necessity. (10 McQuillin, Municipal Corporations, § 29.05, p. 172.) Certainly annexation of subdivision land to provide homesites for its inhabitants is a necessary power of a city. The question is whether one council, in carrying out a necessary power, can make a contract similar to the one here, that binds its successors. Any doubt on this point was set at rest by the Supreme Court in *Denio* v *City of Huntington Beach,* 22 Cal.2d 580, at page 590 [140 P.2d 392] : "It is our opinion, however, that the law is settled in California that a contract made by the council or other governing body of a municipality, which contract appears to have been fair, just, and reasonable at the time of its execution, and prompted by the necessities of the situation or in its nature advantageous to the municipality at the time it was entered into, is neither void nor voidable merely because some of its executory features may extend beyond the terms of office of the members of such body. In the absence of some other ground of avoidance, such a contract is binding upon the municipality and may not be summarily canceled by a successor council."

 City argues that what was good for the people of Madera in 1947, when there was a shortage of building lots within the city and the need for housing was critical, no longer obtained in 1960 when plaintiff demanded fulfillment of the contract. Granting the assertion is correct, it is not a ground for voiding a contract valid when made; it simply illustrates lack of foresight by the 1946-1947 council in not restricting the

time for performance. To a like argument the Supreme Court answered, in *In re City & County of San Francisco,* 191 Cal. 172, at page 184 [215 P. 549]:

"The argument that the agreement is an improvident and unwise one for the City to make is one often heard in opposition to municipal contracts. It is effectually answered by a restatement of the rule that 'When the legislature has committed to a municipal body the power to legislate upon given subjects, or has committed to it judgment or discretion as to matters upon which it is authorized to act, courts of equity have no power to interfere with such a body in the exercise of its legislative or discretionary functions.'"

In any event, the annexation policy of the council in 1947 was not binding upon its successors or, for that matter, the 1947 council, except as to those subdivisions that were actually annexed by agreement made pursuant to the policy.

The unwisdom of the council in not being more specific as to time for performance brings us to city's second contention, that the contract itself is void for uncertainty. The evidence is uncontradicted that no time for performance was fixed by the terms of the agreement. The facilities were to be installed when the subdivider built houses and the need for the facilities arose.

However, it was city that insisted upon this arrangement; it inserted the element of uncertainty in the contract, to which it now objects. The critical fact, nevertheless, is that any uncertainty existing in the first instance was cured by the time this action was filed. Plaintiff resumed building in the subdivision in 1960 and made demand for final and complete performance of the agreement in 1960 before this action was commenced. Thus city's question of how long might a contract of this kind run before it can be said to be void for indefiniteness, is academic in the posture of this case. Any uncertainty was removed by plaintiff's performance and his request for complete performance by city, made before repudiation or rescission of the agreement.

That one party to the contract is a city does not prevent application of classic rules governing the interpretation of contracts. This we learn from *Sawyer* v. *City of San Diego,* 138 Cal.App.2d 652, at page 661 [292 P.2d 233], wherein the court said: "However, a contract entered into between a governmental body and an individual is to be construed by the same rules which apply to the construction of contracts between private persons, and in construing a contract, the

primary object is to ascertain and give effect to the intention of the parties as it existed at the time of contracting.''

The view most favorable to city is that the contract was terminable at will by reason of indefiniteness, but city made no attempt to rescind the agreement until after plaintiff demanded final performance. We find an analogy in cases involving the statute of frauds. It has been held that full performance by one party takes the remaining promise out of the statute, and the party who has performed may enforce the contract against the other. (*Bergin* v. *van der Steen*, 107 Cal. App.2d 8, 19 [236 P.2d 613] ; 1 Witkin, Summary Cal. Law, § 97, p. 105; Rest., Contracts, § 198.) We think the same rule is applicable here, and that full performance by plaintiff coupled with his demand for full and final performance by city resolved the question of uncertainty.

City's third contention, directed at the validity of the agreement, is that it violates Government Code sections 37901 and 37902, applicable in 1946 and 1947. By these statutes municipalities constructing, erecting and providing facilities of the kind here involved, were required, when the total expenditures exceeded the sum of $1,000, to do the work by a contract let to the lowest responsible bidder. However, the statutes had no application to city's agreement with plaintiff; it was up to city to determine in what manner it would install the facilities. Plaintiff and his predecessors had no control over the manner in which city performed the agreement, and as to plaintiff the statutes are irrelevant.

We turn now to city's fourth contention, that the agreement violates the provisions of article XI, section 18, of the California Constitution, the pertinent part of which reads as follows: ''No county, city, town, township, board of education, or school district, shall incur any indebtedness or liability in any manner or for any purpose exceeding in any year the income and revenue provided for such year, without the assent of two-thirds of the qualified electors thereof, voting at an election to be held for that purpose, nor unless before or at the time of incurring such indebtedness provision shall be made for the collection of an annual tax sufficient to pay the interest on such indebtedness as it falls due, and also provision to constitute a sinking fund for the payment of the principal thereof, . . .''

One of the earliest cases to articulate article XI, section 18, is *McBean* v. *City of Fresno*, 112 Cal. 159 [44 P. 358, 53 Am.St.Rep. 191, 31 L.R.A. 794], wherein McBean entered into

a contract with the City of Fresno to take care of and dispose of the sewage of the city for a period of five years for the sum of $4,900 per year payable quarterly. The court said, at page 166: "In a certain very restricted sense it may be said that a liability is created by a contract such as this, but to call it a present liability for the aggregate amount of the payments in the contract contemplated thereafter to be made is not legally permissible." (*See City of Los Angeles* v. *Offner,* 19 Cal.2d 483 [122 P.2d 14, 145 A.L.R. 1358].)

City argues that the entire obligation became due in the fiscal year 1946-1947 when plaintiff's predecessor brought his subdivision within the city. If this were correct, no violation of article XI, section 18, occurred, since there was a $25,300.52 balance at the end of that year in the general fund of the City of Madera. In addition to the general fund available, Mayor Gordon testified:

"Q. Now, Mr. Gordon, were there any funds available at the time this discussion first came up with Mr. Rogers about the installation of the improvements? A. Yes, there was. As I recollect it, we voted bonds to build a sewer plant and to provide some fire equipment and sewer and water pipe in the Water Department. And when we got the bonds sold, the War was on, and they would not let us—we could not get the equipment or materials—everything was frozen as far as materials. So we invested the money in Government bonds and drew interest on it until the time arrived when we could use it to buy—to put in the sewer farm, which we did, and to do all the other things the bond money was to go for."

Although funds were available in 1946-1947, we do not agree with city's contention that the obligation was incurred that year; we hold that the obligation with which we are concerned did not accrue until early in 1960 when plaintiff began the construction of houses and demanded that city complete the installation of facilities. We recur to Mayor Gordon's testimony: "But we did agree that we would not put any in there until the houses were ready to hook on. I recollect that, because lots of subdividers wanted us to lay the water and sewer lines, and they would be buried in the ground doing nobody any good. We didn't want to do it until they were ready to be used."

Demand was made in 1960, and at the end of the fiscal year 1960-1961 there was $186,400.92 in general funds of the City of Madera so that article XI, section 18, was not violated whether the obligation was incurred in 1946-1947 or 1960-1961.

Our determination that city's obligation to install the facilities in question arose early in 1960, disposes of city's contention that plaintiff is barred by the statute of limitations, since this action was filed in 1961.

City also charges plaintiff with laches which, of course, does not depend upon any particular time period, but rather upon whether plaintiff's delay prejudiced city to the degree that it is now inequitable to hold city to its agreement. (*Maguire* v. *Hibernia Sav. & Loan Soc.*, 23 Cal.2d 719, 736 [146 P.2d 673, 151 A.L.R. 1062].) But we have not been shown that city is being required to do anything other than it agreed to do in the first place, so that it has not altered its position in reliance upon plaintiff's inaction. Looking at the other side of the coin, plaintiff bought the property, incurred an indebtedness and constructed buildings on the subdivision in reliance upon the agreement. It would be inequitable to permit city to now repudiate the agreement.

Before turning to the assignment of Rogers' interest in the agreement, it should be made clear that we do not approve city's failure to keep complete council minutes or to reduce the agreement to writing, nor of its insistence upon an indefinite time for performance. But since we find no legislative requirement relating to these aspects of municipal contracts by general law cities, we hold, for the reasons discussed above, that the agreement is binding.

We turn now to the evidence surrounding the assignments of Rogers' rights under the agreement. Plaintiff's chain of title consisted of conveyances from Rogers through intervening owners by written documents, none of which referred to Rogers' agreement with city. Testimony of oral assignments of the contract was received over city's objection to varying the terms of the written documents of conveyance by parol evidence. City, however, did not challenge plaintiff's title; it simply questioned the assignments which related to the property. City, as obligor, is entitled to clear and positive proof of the assignment to protect it from any further claim by plaintiff's predecessor (*Cockerell* v. *Title Ins. & Trust Co.*, 42 Cal.2d 284, 292 [267 P.2d 16]), but this right does not restrict proof of the assignments to the primary documents of conveyance.

It is well settled that the parol evidence rule does not preclude proof of a contemporaneous oral agreement collateral to and not inconsistent with a written contract that is either incomplete or silent on the subject. The Supreme

Court held, in *American Industrial Sales Corp.* v. *Airscope, Inc.*, 44 Cal.2d 393, 397 [282 P.2d 504, 49 A.L.R.2d 1344]: "It has long been the rule that when the parties have not incorporated into an instrument all of the terms of their contract, evidence is admissible to prove the existence of a separate oral agreement as to any matter on which the document is silent and which is not inconsistent with its terms." (See *Pollyanna Homes, Inc.* v. *Berney*, 56 Cal.2d 676 [16 Cal.Rptr. 345, 365 P.2d 401].)

Having concluded that parol evidence was admissible to prove the assignments, the question narrows to whether the evidence supports the finding that "Plaintiff had acquired all remaining rights under said contract which were originally held by Rogers." The testimony is sufficient, if credible, and we cannot say that it is not. It was believed by the trial court and the finding is supported by substantial evidence.

There remains only the question of damages. City argues that plaintiff cannot maintain an action in mandamus to compel it to install the facilities, and for the court to allow plaintiff as damages the cost of making the improvements, is to do indirectly that which the court cannot do directly. Without attempting to weigh the accuracy of city's supposition that mandamus will not lie in this kind of case, we point out that in many situations where a contract may not be specifically enforced damages may be recovered for its breach. In 10 McQuillin, Municipal Corporations, section 29.124, pages 495-496, it is said that: "Municipal contracts are measured by the same tests and are subject to the same rights and liabilities as are other contracts. It follows that a city may be sued on its valid contracts, and, if not in default, may sue to enforce such an agreement. Thus, it is established that, if a contract has been violated by the municipality, the other party thereto may at once sue to recover damages for its breach, or to recover the amount due thereon in the same manner as though the contract had been made with an individual, firm or private corporation." (Accord: *Sawyer* v. *City of San Diego, supra,* 138 Cal.App.2d 652.)

We conclude that plaintiff had the right to bring this action for damages, but we are concerned, nevertheless, by city's observation that although plaintiff recovered a judgment for $26,465 he paid out only $1,500. Nothing in the judgment requires him to install the rest of the facilities which will cost $24,965. Plaintiff testified that he holds the property subject to a purchase price deed of trust upon which a sub-

stantial amount remains unpaid. Should he abandon the subdivision and pocket the cash, the taxpayers whose money must make good city's obligation, will receive absolutely nothing for the $24,965 awarded plaintiff. Even worse, abandonment of the subdivision without facilities could result in a blighted pocket in a modern subdivision area.

City might have avoided this possibility by seeking declaratory relief in equity, but it did not. However, city sought relief in equity and so did plaintiff, and both advanced arguments to this court founded on equity. ▆▆ Since both have appealed to the equity powers of the court, we are not foreclosed from weighing appropriate equitable considerations to the end of preventing a forfeiture of the taxpayers' money. Clearly, this reviewing court cannot modify the judgment by requiring city to perform the agreement, but equity impels an alternative judgment giving city an opportunity to install the facilities within a reasonable time or pay the judgment. Such an alternative is in keeping with a fundamental principle of equity, appearing in 1 Pomeroy, Equity Jurisprudence (5th ed. 1941) section 116, pages 155-156, to wit:

"The remedial system of equity as a whole, with its great variety of specific remedies which enforce the very primary rights and duties of persons rather than give pecuniary equivalents for their violation, with its power to enlarge the scope of these ordinary forms of relief, and even to contrive new ones adapted to new circumstances, with its comprehensive rules concerning parties, and with its unlimited control over the form and material of its judgments, possesses enormous advantages over the narrow, inflexible, and artificial methods of the common law.

"The reformed American procedure has attempted to combine the two, or rather to enlarge the equity doctrines and rules, so that they may embrace all actions, legal as well as equitable; and in those states where the courts have accepted and carried out the reform in its true spirit, this attempt has been successful as far as is possible from the essential elements of the two jurisdictions." (See *Strain* v. *Security Title Ins. Co.*, 124 Cal.App.2d 195, 201 [268 P.2d 167]; *People* ex rel. *Mosk* v. *National Research Co. of Cal.*, 201 Cal.App.2d 765, 775 [20 Cal.Rptr. 516].)

The Supreme Court in 1878 observed that equity will, when the circumstances justify, disregard form and look to the substance if a forfeiture is threatened. This broad ameliorating principle is stated thus in *Keller* v. *Lewis*, 53 Cal. 113, at page

118: "It is a *universal rule* in equity never to enforce either a penalty or forfeiture. [Citation.] On the contrary, equity frequently interposes to prevent the enforcement of a forfeiture at law."

Although the judgment here does not present a forfeiture in the classic sense, it provides plaintiff the means for effecting a forfeiture should he so elect, by collecting the money judgment and refusing to install the facilities.

Since plaintiff's theory of the case and the judgment are predicated upon the cost of the facilities in place, and both presuppose that the facilities will be installed, we modify the judgment to provide that plaintiff shall recover the $1,500 which he paid for facilities and that city shall have six months after this judgment becomes final within which to install the remainder of the facilities required under the terms of the agreement, or to pay plaintiff the additional sum of $24,965.

The judgment as modified is affirmed.

Conley, P. J., concurred.

A petition for a rehearing was denied May 18, 1965, and appellant's petition for a hearing by the Supreme Court was denied June 16, 1965.