[No. B136088. Second Dist., Div. Six. Oct. 18, 2000.]

SANTA MARGARITA AREA RESIDENTS TOGETHER et al., Plaintiffs and Appellants, v.
SAN LUIS OBISPO COUNTY BOARD OF SUPERVISORS, Defendant and Respondent;
SANTA MARGARITA LIMITED, Real Party in Interest and Respondent.

222

**COUNSEL**

Environmental Defense Center and Alexander T. Henson for Plaintiffs and Appellants.

James B. Lindholm, Jr., County Counsel, and Timothy McNulty, Deputy County Counsel, for Defendant and Respondent.

McCutchen, Doyle, Brown & Enersen, Stephen L. Kostka and Margaret Bielak for Real Party in Interest and Respondent.

**OPINION**

**PERREN, J.**—Santa Margarita Area Residents Together, an association; Kenneth Haggard; and Otto Schmidt appeal the judgment denying their petition for writ of mandate to set aside a development agreement between defendant San Luis Obispo County (County) and real party in interest Santa Margarita Limited. To develop its property, Santa Margarita Limited needs to be certain that the law governing local development will not change during the development process. Relying on the development agreement statute,[1] the landowner and County agreed to a development plan. Appellants contend that the agreement is invalid under the statute because it covers the planning stage of a real estate development before buildings or other structures have been designed or approved. Appellants also contend that, under these circumstances, the zoning "freeze" in the agreement unconstitutionally contracts away the County's police power. We conclude that this agreement, which assigns rights and obligations to both government and developer concerning the planning of a large real estate project, complies with the statute and does not contract away the County's police power. We affirm.

[1](Gov. Code, § 65864 et seq.) All further statutory references are to the Government Code unless otherwise stated.

FACTS AND PROCEDURAL HISTORY

The Santa Margarita Ranch (Ranch) consists of approximately 13,800 acres of real property in San Luis Obispo County. The owner of the Ranch, Santa Margarita Limited, has long desired to develop the Ranch. Santa Margarita Area Advisory Council, a community organization, has opposed the development. After Santa Margarita Limited sued the County to facilitate development by increasing the number of legal parcels in the Ranch, Santa Margarita Limited, the County, and representatives of the Santa Margarita Area Advisory Council agreed to mediate their differences over long-range development of the Ranch. The mediation achieved a consensus among most of the participants, including representatives from the Santa Margarita Area Advisory Council. A mediation report reflecting the consensus recommended approval of a project which would include 550 housing units and nonresidential improvements in an 1,800-acre area, devote at least 8,400 acres to permanent open space easements, and place a minimum of 3,600 acres under 40-year Williamson Act contracts for preservation of agricultural land.[2] The report also recommended use of a development agreement to guarantee that the 550 residential units would be "subject to applicable laws and regulations."

Shortly after the mediation, the County began preparing a development agreement with Santa Margarita Limited for the specific planning of a project which would include the improvements and other land uses specified in the mediation report and which also designated a golf course, guest lodge, equestrian center, bikeways, and parklands as nonresidential improvements (Project). At the same time, the County amended part of its general plan, the Salinas River Area Plan, to describe the Project and establish certain criteria for its ultimate implementation.

After lengthy negotiations and a public hearing, the County enacted an ordinance authorizing it to enter into the development agreement (Agreement). The next day, the chairperson of the County's board of supervisors signed the Agreement.

DISCUSSION

*Santa Margarita Agreement*

In general, the Agreement freezes zoning on the Project property in return for the developer's commitment to submit a specific plan for construction in

---

[2]The Williamson Act, section 51200 et seq., permits local governments to enter into contracts limiting the use of land to agricultural purposes in return for preferential tax treatment. (*Kelsey v. Colwell* (1973) 30 Cal.App.3d 590, 592 [106 Cal.Rptr. 420].)

compliance with County land use requirements. Contingencies and further approvals remain, but the Agreement commits the County and Santa Margarita Limited to the Project, including its public improvements and amenities.

Specifically, the Agreement provides that Santa Margarita Limited will file a comprehensive application for approval of the Project, including a specific plan, a vesting tentative map, and an environmental impact report. The specific plan must incorporate the standards set forth in the Salinas River Area Plan. The application must state that Santa Margarita Limited will commit itself to develop the Project in its entirety and to engage in all necessary environmental review. The Agreement also provides that Santa Margarita Limited will dedicate land for a public swimming pool, sewer treatment plant, and cemetery expansion.

In return for these commitments, the County agrees to process, review, and approve or disapprove the specific plan, and to apply its current zoning and other land use regulations to the plan without change for up to five years during the review and approval period.[3] The Agreement is entered into under the authority of the Development Agreement Statute and satisfies its technical requirements.

The Agreement does not give Santa Margarita Limited a right to construct the Project or impose upon it an obligation to do so. Rather, the Agreement contemplates a second development agreement pertaining to the actual construction of the Project, and requires that the County and Santa Margarita Limited "will make a good faith effort to negotiate a Subsequent Development Agreement that shall, if agreed upon, provide [Santa Margarita Limited] with a vested right to the benefits and burdens of the Project." It provides that the parties "ultimately seek to secure . . . an enforceable arrangement" allowing construction, but neither party "obligates itself to benefit or burden the Project Site with the above-described Project until such time as a Final EIR is certified, the Specific Plan application is favorably acted upon by the County, [and] the Subsequent Development Agreement . . . becomes binding on the parties . . . ."

### Development Agreement Statute

The development agreement statute permits a city or county to "enter into a development agreement" with any property owner "for the development of the property." (§ 65865, subd. (a).) In essence, the statute allows a city or

---

[3]The Agreement provides for a five-year term with a two-year extension in the event of litigation concerning the Agreement. Although this lawsuit may trigger the two-year extension, we will refer to the Agreement as having a five-year term.

county to freeze zoning and other land use regulation applicable to specified property to guarantee that a developer will not be affected by changes in the standards for government approval during the period of development. (*City of West Hollywood v. Beverly Towers, Inc.* (1991) 52 Cal.3d 1184, 1193, fn. 6 [278 Cal.Rptr. 375, 805 P.2d 329]; *Citizens for Responsible Government v. City of Albany* (1997) 56 Cal.App.4th 1199, 1213 [66 Cal.Rptr.2d 102].) In the words of the statute, "[u]nless otherwise provided by the development agreement, rules, regulations, and official policies governing permitted uses of the land, governing density, and governing design, improvement, and construction standards and specifications, applicable to development of the property subject to a development agreement, shall be those rules, regulations, and official policies in force at the time of execution of the agreement." (§ 65866.)

The statute declares that "lack of certainty in the approval of development projects can result in a waste of resources, escalate the cost of housing and other development to the consumer, and discourage investment in and commitment to comprehensive planning which would make maximum efficient utilization of resources at the least economic cost to the public." (§ 65864, subd. (a).) The statute reflects the Legislature's conclusion that giving "[a]ssurance to the applicant for a development project that upon approval of the project, the applicant may proceed with the project in accordance with existing policies, rules and regulations, and subject to conditions of approval, will strengthen the public planning process, encourage private participation in comprehensive planning, and reduce the economic costs of development." (§ 65864, subd. (b).)

Particulars of the statute include requirements that a development agreement may be approved only after a public hearing (§ 65867) and must be consistent with the general plan and any specific plan (§ 65867.5), a provision permitting annual review by the governmental entity and termination for noncompliance (§ 65865.1), and a statement that the agreement is subject to referendum (§ 65867.5). The statute also specifies certain provisions which may or must be included in a development agreement. (§ 65865.2.)

### Santa Margarita Agreement Complies with Statute

■ In reviewing the Agreement and ordinance approving the Agreement, we must consider two standards of review. A development agreement is a legislative act (§ 65867.5) and the County's board of supervisors has the discretion to determine what legislation is necessary and appropriate. A reviewing court will not set aside a legislative act unless it is arbitrary,

capricious, or unlawful. (*California Assn. of Psychology Providers v. Rank* (1990) 51 Cal.3d 1, 11 [270 Cal.Rptr. 796, 793 P.2d 2]; *Corona-Norco Unified School Dist. v. City of Corona* (1993) 17 Cal.App.4th 985, 992 [21 Cal.Rptr.2d 803].) On the other hand, courts independently decide purely legal issues such as statutory interpretation. We review the Agreement to determine if it enlarges or impairs the terms of the authorizing statute without deference to the County. (*California Assn. of Psychology Providers v. Rank, supra*, at p. 11.) ▮ Based on these standards, we conclude that the Agreement complies with the development agreement statute, and that the County's exercise of its legislative power to enter into the Agreement was not arbitrary or capricious.

Appellants contend that the Agreement is invalid under the statute because the statute permits a development agreement only after a project has been approved for actual construction. Appellants claim that, without a fully designed and approved project, the Agreement is essentially a unilateral County agreement to freeze zoning without obtaining any public benefits in return.

Appellants interpret the statute and the Agreement too narrowly. The statute is best served through a liberal construction which encompasses agreements that substantially comply with its specific terms and conditions and achieve its essential objectives. (*National Parks & Conservation Assn. v. County of Riverside* (1996) 42 Cal.App.4th 1505, 1522 [50 Cal.Rptr.2d 339].) To interpret the statute and Agreement in any other manner would unduly restrict the County from working with a private landowner to plan and develop facilities which support public needs.

Moreover, the statement of legislative purpose in section 65864 encourages the creation of rights and obligations early in a project in order to promote public and private participation during planning, especially when the scope of a project requires a lengthy process of obtaining regulatory approvals. The statute recognizes that comprehensive planning is important in controlling the economic and environmental costs of development. It should be construed to allow development agreements as soon as the government and developer are required to make significant financial and personnel commitments to a project.

The Agreement conforms to this construction of the statute. Because it focuses on the planning stage of the Project, the Agreement meets, rather than evades, the purpose of the statute. The Agreement maximizes the public's role in the final development and control over the inclusion of

public facilities and benefits in the project. It also permits the County to monitor the planning of the Project to effectively assure compliance with existing County land use regulations.

Additionally, environmental review is advanced by considering environmental issues at the earliest feasible time. (*Fullerton Joint Union High School Dist. v. State Bd. of Education* (1982) 32 Cal.3d 779, 797 [187 Cal.Rptr. 398, 654 P.2d 168].) The Agreement makes environmental review an integral part of the planning process, thus avoiding the sort of *"post hoc* rationalizations to support action already taken" which might occur if environmental review were deferred until later. (See *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 394 [253 Cal.Rptr. 426, 764 P.2d 278].)

Appellants contend that the County does not approve an actual development project in the Agreement. We disagree. The Agreement establishes the scope of the Project and precise parameters for future construction as well as a procedure to process Project approvals. It also provides for a variety of improvements for public use which may not have been offered by the developer without corresponding commitments by the County as outlined in the Agreement. The Agreement must be construed as an approval of the Project because it commits the parties to a definite course of action aimed at assuring construction of the Project, provided certain contingencies are met.

While further agreement and discretionary approvals are necessary, every approval or denial permitted by the Agreement is designed to advance the project in accordance with the standards for Ranch development adopted by the County in the Salinas River Area Plan. As shown by the record, the County and the participants in the mediation which preceded the Agreement intend the Agreement to play a critical role in facilitating the completion of a large-scale real estate development. There is nothing in the Development Agreement Statute inconsistent with this type of development agreement.

The development agreement statute was enacted after *Avco Community Developers, Inc. v. South Coast Regional Com.* (1976) 17 Cal.3d 785 [132 Cal.Rptr. 386, 553 P.2d 546]. In *Avco,* a new land use requirement was enacted after prebuilding permit construction work had been done on a project. The Supreme Court held that a developer has no vested right to complete a project before building permits are issued. In so ruling, the court stated that any change in the rule that a developer has no vested rights in existing zoning must come from the Legislature. (*Id.* at pp. 793, 796.)

The Legislature accepted the Supreme Court's invitation and responded with a statute permitting local governments to freeze zoning early in the

development process and before the issuance of building permits. Indeed, appellants concede that development agreements are permitted before the issuance of building permits, just not too much before. Appellants seek to limit the statute to situations which roughly correspond to the facts in *Avco*.

The statute does not support this position. The statute is limited to actual projects, but does not require deferral of development agreements until construction is ready to begin or require any particular stage of project approval as a prerequisite. In fact, by permitting conditional development agreements when property is subject to future annexation, section 65865, subdivision (b) expressly permits local government to freeze zoning and other land use regulation before a project is finalized. (See *National Parks & Conservation Assn. v. County of Riverside, supra,* 42 Cal.App.4th at pp. 1521-1522.)

This specific provision supports the general conclusion that the development agreement statute permits local government to make commitments to developers at the time the developer makes a substantial investment in a project. Here, that time had certainly arrived when the Agreement was executed.

Appellants cite no legal authority, and we have found none, which limits the statute to development agreements which create "vested rights" to complete construction of a project according to completed plans. In fact, the scant authority dealing with development agreements is to the contrary and focuses on the broad purpose of the statute to provide assurances to developers as soon as project commitments must be made. (See *National Parks & Conservation Assn. v. County of Riverside, supra,* 42 Cal.App.4th at pp. 1521-1522; *Citizens for Responsible Government v. City of Albany, supra,* 56 Cal.App.4th at p. 1213.)

Moreover, the statute expressly contemplates "discretionary approvals" after the execution of a development agreement (§ 65865.2) and includes a provision concerning annual review and termination. Under section 65865.1, a landowner is "required to demonstrate good faith compliance with the terms of the agreement" at the time of each annual review. "If, as a result of such periodic review, the local agency finds and determines, on the basis of substantial evidence, that the applicant or successor in interest thereto has not complied in good faith with terms or conditions of the agreement, the local agency many terminate or modify the agreement." (*Ibid.*) Contrary to claims by appellants, these provisions are not so narrow as to restrict the scope of the statute to situations where all planning and design work has been completed and approved.

■ Appellants also contend that the Agreement is invalid under the statute because it does not include all of the provisions required by section 65865.2. Again, we disagree. Section 65865.2 states that a development agreement "shall specify the duration of the agreement, the permitted uses of the property, the density or intensity of use, the maximum height and size of proposed buildings, and provisions for reservation or dedication of land for public purposes." The Agreement substantially complies with the requirements of this section. The Agreement specifies its duration, the permitted uses of the Ranch and the density or intensity of use, and provides for reservation or dedication of land for public purposes.

The Agreement fails to mention the maximum height and size of proposed buildings. But, as Santa Margarita Limited points out, the Agreement is subject to the existing County land use ordinances which limit the height and size of buildings in two ways. First, they explicitly limit building height in general. Second, they limit the total size of buildings by requiring setbacks from lot lines.[4] (See San Luis Obispo County Land Use Ord., §§ 22.04.100 to 22.04.124.) The Salinas River Area Plan also sets a maximum building height for the Ranch and, by specifying the total number of residential units, the Agreement creates a frame of reference for building size. Moreover, both the Agreement and the statute contemplate annual review with final approval vested in the County. What remains static are the rules under which the approval will be sought.

Finally, the Agreement was approved by an ordinance duly enacted by the County Board of Supervisors and we defer to that body in matters pertaining to the merits, usefulness and public advantages of the Agreement. One of the purposes of development agreements is to obtain benefits for the public, and the record shows that the County believed that an agreement was required as an incentive to the developer to engage in the comprehensive planning desired by the County, and also as an incentive to expand the public facilities and benefits included in the Project.

The Agreement also represents the resolution of a protracted dispute and balances the interests of all concerned parties. Santa Margarita Limited sought a more comprehensive agreement but, according to a planning commission staff report, the County decided to "lock in" the Salinas River Area Plan standards while deferring construction approval. The record reveals that the County's decision resulted from careful assessment of the importance of the Ranch to the region.

---

[4]We grant respondents' request and take judicial notice of chapter 4 of County's land use ordinance.

The record also reveals that the Agreement resulted from a mediation by parties interested in the future of the Ranch. The mediation did not result in unanimity but produced an agreement among most participants, including representatives of the public. As such, the mediation and Agreement reflect an inclusive and open governmental process.

### Surrender of Police Power

■ As well as arguing that the Agreement does too little to satisfy the statute, appellants argue that it does too much to avoid constitutional infirmity. Appellants contend that the freeze on Ranch zoning before a project that is ready for construction constitutes the contracting away of the County's zoning authority and, therefore, a surrender of the right to exercise its police power in the future. We disagree. If anything, case law concerning a municipality's "surrender" of its regulatory authority supports the conclusion that the Agreement, as well as the development agreement statute, satisfies all constitutional mandates concerning a city or county's exercise of its regulatory authority.

It is established that a city or county may not contract away its right to exercise police power in the future (*Avco Community Developers, Inc. v. South Coast Regional Com., supra,* 17 Cal.3d at p. 800) and that the power to enact, modify, and amend zoning and other land use regulations constitutes a part of a county's police power. (*Alameda County Land Use Assn. v. City of Hayward* (1995) 38 Cal.App.4th 1716, 1724 [45 Cal.Rptr.2d 752].) Therefore, the development agreement statute must be construed in a manner that does not permit the County to surrender its police power in the name of planning efficiency. (See *Conway v. Pasadena Humane Society* (1996) 45 Cal.App.4th 163, 177 [52 Cal.Rptr.2d 777].)

The Agreement in this case presents no such constitutional infirmity. Land use regulation is an established function of local government and the County has authority to enter into contracts to carry out this function. (§ 23004, subd. (c); *Carruth v. City of Madera* (1965) 233 Cal.App.2d 688, 695 [43 Cal.Rptr. 855]; see also *Professional Engineers v. Department of Transportation* (1993) 13 Cal.App.4th 585, 591-592 [16 Cal.Rptr.2d 599].) A contract which "appears to have been fair, just, and reasonable at the time of its execution, and prompted by the necessities of the situation or in its nature advantageous to the municipality at the time it was entered into, is neither void nor voidable merely because some of its executory features may extend beyond the terms of office of the members" of the legislative body which entered into the contract. (*Denio v. City of Huntington Beach* (1943) 22 Cal.2d 580, 590·[140 P.2d 392, 149 A.L.R. 320]; *Carruth, supra,* at p. 695.)

A governmental entity does not contract away its police power unless the contract amounts to the "surrender" or "abnegation" of a proper governmental function. (*Morrison Homes Corp. v. City of Pleasanton* (1976) 58 Cal.App.3d 724, 734 [130 Cal.Rptr. 196].) The zoning freeze in the Agreement is not such a surrender or abnegation. The Project must be developed in accordance with the County's general plan (§ 65867.5), and the Agreement does not permit construction until the County has approved detailed building plans. The Agreement retains the County's discretionary authority in the future and, in any event, the zoning freeze is for five years. It is not of unlimited duration.

The County concluded that the zoning freeze in the Agreement advances the public interest by preserving future options. This type of action by the County is more accurately described as a legitimate exercise of governmental police power in the public interest than as a surrender of police power to a special interest. (*Morrison Homes Corp. v. City of Pleasanton, supra,* 58 Cal.App.3d at p. 734; see also *Housing Authority v. City of L. A.* (1952) 38 Cal.2d 853, 868 [243 P.2d 515].)

CONCLUSION

Seventy-five years ago, the Supreme Court stated that the "police power, as such, is not confined within the narrow circumspection of precedents, resting upon past conditions which do not cover and control present-day conditions obviously calling for revised regulations to promote the health, safety, morals, or general welfare of the public. That is to say, as a commonwealth develops politically, economically, and socially, the police power likewise develops, within reason, to meet the changed and changing conditions." (*Miller v. Board of Public Works* (1925) 195 Cal. 477, 484 [234 P. 381, 38 A.L.R. 1479].) If anything, the court's statement in *Miller* resonates more clearly today than when it was first made, and provides a framework for the analysis of this case. Here, the development agreement statute and the constitutional mandate requiring the County to retain its regulatory power intersect to permit the contemporary approach to land use regulation reflected in the Agreement.

It is true that local government may not surrender its regulatory power through ad hoc commitments. It may, however, act in partnership with private enterprise, as authorized by the development agreement statute and the Agreement. The Agreement addresses recurring land use issues without limiting the County's regulatory discretion. Through the Agreement, the County tailors the exercise of its legislative power to the complex issues

involved in regulating a major real estate project in the public interest. By requiring expeditious Project planning and preserving future options, the Agreement enhances the County's power to regulate land use to achieve its Salinas River Area Plan and other land use goals.

The judgment is affirmed. Costs on appeal are awarded to Santa Margarita Limited.

Gilbert, P. J., and Coffee, J., concurred.

A petition for a rehearing was denied November 15, 2000, and appellants' petition for review by the Supreme Court was denied January 17, 2001. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.