Filed 2/2/23  FC Pier 70 v. City and County of San Francisco CA1/5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

<table>
<tr><td>

FC PIER 70, LLC,

     Plaintiff and Appellant,

v.

CITY AND COUNTY OF SAN FRANCISCO,

     Defendant and Respondent.

</td><td>

A164411

(San Francisco City and County Super. Ct. No. CGC-21-589577)

</td></tr>
</table>

     The City and County of San Francisco (the City) and FC Pier 70, LLC (FC Pier) executed a development agreement governing redevelopment of a portion of the Pier 70 waterfront in San Francisco.  Thereafter San Francisco voters approved Proposition I, which doubled the transfer tax rate on certain real estate transactions.  FC Pier sued the City, alleging that they agreed, in the development agreement, to insulate the project from subsequent increases in the transfer tax rate.  The trial court concluded that the agreement was reasonably susceptible to such a construction but that (so construed) the agreement unconstitutionally contracted away the City's taxation power.  FC Pier appeals from a judgment of dismissal, arguing that the trial court erred in sustaining the City's demurrers with respect to its breach of contract and reformation causes of action.  We disagree and affirm.

1

## BACKGROUND

### A.

To protect the government's essential taxation power, the California Constitution provides: "The power to tax may not be *surrendered or suspended* by grant or contract." (Cal. Const., art. XIII, § 31 (hereafter section 31), italics added; *People ex rel. Franchise Tax Bd. v. Superior Court* (1985) 164 Cal.App.3d 526, 542, disapproved on other grounds by *Dana Point Safe Harbor Collective v. Superior Court* (2010) 51 Cal.4th 1, 11, fn. 6.)

In *Russell City Energy Co., LLC v. City of Hayward* (2017) 14 Cal.App.5th 54 (*Russell*), this Division held that a power company could not state a cause of action for breach of contract after the City of Hayward imposed a new utility tax because the power company's interpretation of a contractual clause violated section 31's prohibition. (*Id.* at pp. 57-58, 62-64, 66, 69.)

In reaching this conclusion, the *Russell* court gave the terms " 'surrendered' " and " 'suspended' " their ordinary meaning—and concluded that surrender means " 'to give up completely or agree to forgo especially in favor of another' " and that suspended is synonymous with " 'temporarily debarred, inactive, inoperative and held in abeyance.' " (*Russell, supra*, 14 Cal.App.5th at p. 64.) *Russell* also determined that the relevant clause of the parties' contract—which provided that the City of Hayward " 'shall not impose any other levies, fees, taxes, contributions, or charges on [the power company] . . . other than such levies, fees, taxes, contributions, or charges generally applicable to similarly situated owners of real property' "— temporarily inactivated the City of Hayward's power to tax for the life of the power plant and thereby "unquestionably suspended its power to tax." (*Id.* at pp. 58, 64.)

2

**B.**

In May 2018, FC Pier and the City entered into two contracts relating to redevelopment of Pier 70: a development agreement and a disposition and development agreement (hereafter the disposition agreement).

The disposition agreement makes FC Pier responsible, as master developer, for subdividing and completing horizontal improvements on the 28-acre site—i.e., grading, environmental remediation, construction of streets and utilities—to support the eventual construction of vertical improvements. The disposition agreement provides that the City, acting through the San Francisco Port Commission (Port), will eventually sell or lease project parcels to "vertical developer[s]," for the construction of residential and commercial buildings. The agreement further provides FC Pier with the option to acquire any of the parcels for its own vertical development. The parcels' sale and lease prices are determined through a contractual appraisal process set forth in the disposition agreement.

In the development agreement, the parties agreed, in section 5.2, that generally the City would process permits and other regulatory approvals according to "Existing City Laws and Standards"—a defined term that means the project approvals, transaction documents, and applicable "City Laws" (another defined term that describes zoning, construction, environmental, and land use laws) in effect on December 15, 2017, when the San Francisco Board of Supervisors approved the development agreement. This provision is subject to section 5.3 of the development agreement, which states that "any Change to Existing City Laws and Standards" (a third defined term) also apply unless they would cause certain defined conflicts that would hinder the development.

None of these key defined terms (which we discuss in more detail below) mention the City's tax laws. Notably, *Russell,*

3

*supra,* 14 Cal.App.5th 54 was decided in August 2017, before the effective date of the development agreement ordinance. Also before that time, San Francisco voters increased the particular tax at issue here—the City's transfer tax on real property—three times in eight years, including in 2016. (S.F. Bus. & Tax Regs. Code, § 1102, amendment history available at <https://codelibrary.amlegal.com/codes/san_francisco/latest/sf_business/0-0-0-2352> [as of Feb. 1, 2023]; S.F. Voter Information Pamp., Gen. Elec. (Nov. 2, 2010), Digest, p. 159; S.F. Voter Information Pamp., Consolidated Gen. Elec. (Nov. 4, 2008), Digest, p. 175.) All of these events occurred before the development agreement was signed in May of 2018.

Almost three years after the effective date of the development agreement ordinance, in 2020, voters increased the transfer tax again. The City announced its intent to apply the applicable Proposition I transfer tax rate to any future transfers of project parcels valued at more than $10 million. FC Pier then sued the City.

## C.

In its initial complaint, FC Pier alleged three causes of action: (1) anticipatory breach of contract; (2) restitution; and (3) declaratory and injunctive relief. FC Pier's first cause of action alleged that the City's plan to apply the higher transfer tax rate to any future transfers of project parcels was in anticipatory breach of section 5.3 of the development agreement. FC Pier alleges that the project will be negatively affected because it involves a symbiotic funding process—whereby FC Pier advances horizontal development costs and is reimbursed through transfer proceeds and bond revenues generated in part based on the underlying value of the parcels.

The City demurred, arguing (among other points) that (1) the development agreement is not reasonably susceptible to FC Pier's interpretation (that the City agreed the project would be

4

insulated from any future transfer tax rate increase); and (2) even if the development agreement could be reasonably construed that way, any such promise would violate section 31.

The trial court agreed that FC Pier could not state a claim for breach of contract because adopting FC Pier's interpretation means that, under *Russell, supra*, 14 Cal.App.5th at pages 64-65, 69, the City suspended its power to tax and the contract violates section 31. Accordingly, the trial court sustained the City's demurrer (with leave to amend) as to only the breach of contract cause of action. The court also granted FC Pier leave to add a reformation cause of action. The court otherwise overruled the City's demurrer.

In its first amended complaint, FC Pier chose not to amend its breach of contract cause of action. Its new reformation cause of action alleged that the parties were mutually mistaken about the legal effect of section 5.3 of the development agreement. FC Pier asked the court to rewrite the agreement to require the City to pay the additional amount of transfer tax (attributable to Proposition I) on any future project parcel transfers or to reimburse vertical developers for the additional amount of transfer tax paid on any such parcels.

The City demurred again, arguing FC Pier's reformation cause of action either sought to accomplish an unlawful outcome or to rewrite the contract without the parties' mutual agreement. The trial court agreed and sustained the demurrer without leave to amend with respect to the reformation cause of action.

FC Pier then voluntarily dismissed its remaining causes of action—for restitution and other equitable relief—without prejudice. The trial court entered a judgment in the City's favor.

## DISCUSSION

FC Pier contends that the trial court erred in concluding that, under its interpretation, section 5.3(a) of the development

5

agreement violates section 31.  However, we agree with the City that the judgment should be affirmed on an alternate basis—the development agreement is not reasonably susceptible to FC Pier's interpretation.  (See *Carman v. Alvord* (1982) 31 Cal.3d 318, 324 ["judgment of dismissal . . . will be affirmed if proper on any grounds stated in the demurrer, whether or not the court acted on that ground"].)

## A.

Our review is de novo because this case was resolved on demurrer (*Rosen v. St. Joseph Hospital of Orange County* (2011) 193 Cal.App.4th 453, 458) and because contract interpretation questions ordinarily present pure questions of law.  (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865; *Quantification Settlement Agreement Cases* (2011) 201 Cal.App.4th 758, 797-798 (*Quantification*).)  We accept as true all of plaintiff's properly pled material facts and facts that may be judicially noticed.  However, we disregard contentions, deductions, or conclusions of fact or law.  (*State Dept. of State Hospitals v. Superior Court* (2015) 61 Cal.4th 339, 346.)

In reviewing a breach of contract cause of action on demurrer, we decide whether the alleged agreement is " 'reasonably susceptible' " to the interpretation a plaintiff gives in their complaint.  (*Klein v. Chevron U.S.A., Inc.* (2012) 202 Cal.App.4th 1342, 1384-1385.)  If the pleading does not give the contract a clearly erroneous construction, we must accept the plaintiff's allegations as to its meaning.  (*Ibid.*)

" 'Courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists.' " (*Mercury Ins. Co. v. Pearson* (2008) 169 Cal.App.4th 1064, 1070.)  If possible, a contract is interpreted to give meaning to all of its provisions (Civ. Code, § 1641) and to make the contract lawful, operative, definite, and reasonable.  (Civ. Code, § 1643; *Barham v. Barham* (1949) 33 Cal.2d 416, 429.)  " [E]ven if one provision of

6

a contract is clear and explicit, it does not follow that that portion alone must govern its interpretation; the whole of the contract must be taken together so as to give effect to every part.' [Citation.]  'An interpretation which renders part of the instrument to be surplusage should be avoided.' " (*Quantification, supra*, 201 Cal.App.4th at p. 799.)

**B.**

FC Pier's breach of contract claim is predicated on the notion that the parties agreed to freeze municipal tax laws in section 5.3(a) without explicitly mentioning tax laws.  Its argument requires a convoluted reading of several terms of the agreement, particularly a reference to the phrase "other laws" buried in a definition in an appendix to the development agreement.

First, FC Pier points to section 5.3(a), which reads: "Existing City Laws and Standards and any *Change to Existing City Laws and Standards* will apply to the 28-Acre Site Project *except to the extent that they would conflict* with the Project Approvals, the Transaction Documents, or Applicable Port Laws. In the event of a conflict, the terms of the Project Approvals, Transaction Documents, and Applicable Port Laws *will prevail.*" (Italics added.)  The essential point here is that changes to existing city laws (as defined) apply to the project unless they conflict in ways specified by section 5.3(b).

Next, FC Pier points to the definition, provided in the appendix, of " 'Change to Existing City Laws and Standards' ": "any change to Existing City Laws and Standards *or other laws*, plans, or policies adopted by the City or the Port or by voter initiative after the DA Ordinance Effective Date that would conflict with the Project Approvals, the Transaction Documents, or Applicable Port Laws as specified in DA § 5.3."  (Italics added and bold omitted.)

7

Finally, FC Pier cites the definition of "law" in the appendix: "any of the following validly in effect as of the Reference Date and as later amended, supplemented, clarified, corrected, or replaced during the DDA Term, whether or not within the present contemplation of the Parties: [¶] (i) federal, state, regional, or local constitution, charter, law, statute, ordinance, code, rule of common law, resolution, rule, regulation, standard, directive, requirement, proclamation, order, decree, policy (including the Waterfront Plan and Port and City construction requirements); [¶] (ii) judicial order, injunction, writ, or other decision interpreting any law; [¶] (iii) requirement or condition of any Regulatory Approval of a Regulatory Agency affecting any portion of the 28-Acre Site; and [¶] (iv) recorded covenants, conditions, or restrictions affecting any portion of the 28-Acre Site."

The key to FC Pier's argument is the reference to "other laws" in the definition of "Change to Existing City Laws and Standards." Because "law" is defined to mean practically any law, FC Pier argues that "Change to Existing City Laws and Standards" means both (1) *any* change to Existing City Laws and Standards; and (2) *any* change to *any* other laws, including tax laws.

The City, on the other hand, argues that we must construe the "other laws" language (in the definition of Change to Existing City Laws and Standards) to mean only *new* laws (adopted after the ordinance effective date) that are of the type described in the definition of "City Laws"—in other words, zoning, construction, environmental, and land use laws but *not* tax laws.

To support its position, the City points to the definitions of "City Law" and "Existing City Laws" provided in the development agreement's appendix. "City Law" is defined to mean "any City ordinance or Port code provision and implementing regulations and policies *governing zoning, subdivisions and subdivision*

8

*design, land use, rate of development, density, building size, public improvements and dedications, construction standards, new construction and use, design standards, permit restrictions, development impacts, terms and conditions of occupancy, and environmental guidelines or review* at the FC Project Area, including, as applicable: [¶] (i) the Waterfront Plan and the Design for Development; [¶] (ii) the Construction Codes, applicable provisions of the Planning Code, . . . the Subdivision Code, and the General Plan, [¶] (iii) local Environmental Laws and the City's Health Code; and [¶] (iv) the Other City Requirements (DDA Exh A7)."  (Italics added and bold omitted.) "Existing City Laws and Standards" incorporates the above definition and means "City Laws" in effect on the ordinance effective date, plus the "Project Approvals" and "Transaction Documents."

Although the trial court opined that "the definition of 'Change to Existing City Laws and Standards' is somewhat redundant when read directly into section 5.3," it ultimately concluded that the development agreement was reasonably susceptible to FC Pier's interpretation.  It explained, "There is no clear textual guidance indicating that the 'other laws, plans or policies adopted by the City or the Port or by voter initiative' is intended to exclude taxes, except to the extent that those other laws, plans or policies fail to satisfy the conflict requirement."

## C.

We agree with the City that "other laws" is not reasonably susceptible to FC Pier's interpretation.  Rather, FC Pier's construction is clearly erroneous because, viewed in context, it creates both surplusage and an absurd result. (See *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1265 [" 'language in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract' ", italics omitted].)

9

Here, the context shows that the "other laws" language appears in a derivative definition, which itself (along with section 5.3(a)) specifically deals with the application of City Laws and Standards. The definitions of "City Law" or "Existing City Laws and Standards" carefully describe zoning, construction, environmental, and land use laws, not tax laws. FC Pier removes this context and construes "other laws" via the defined term "law" to mean, literally, any law. This construction would be so broad as to swallow the "City Law" and "Existing City Laws and Standards" definitions. Under FC Pier's reading, the phrase "any change to Existing City Laws and Standards" becomes superfluous because any change to the law in those specified areas would also constitute "laws" adopted after the effective date.

It is implausible that these sophisticated parties went to great pains, in negotiating a *development agreement*, to adopt a carefully circumscribed list of zoning, construction, environmental, and land use laws—in their definitions of "City Laws" and "Existing City Laws and Standards"—only to obliterate that list by also referring to "laws" of all sorts (such as corporate governance, discrimination, tax) in a derivative definition. The Development Agreement Statute (Gov. Code, § 65864 et seq.) allows local governments to enter into valid agreements that freeze *land use* regulation so that a developer will not be affected by changes in such standards during the period of development. (See Gov. Code, §§ 65864, 65865, 65865.2, 65865.4, 65866; *Santa Margarita Area Residents Together v. San Luis Obispo County Bd. of Supervisors* (2000) 84 Cal.App.4th 221, 226.) But there is no mention of tax law in the Development Agreement Statute. (Gov. Code, § 65864 et seq.) FC Pier's interpretation of section 5.3(a) would create an absurd result—by expanding that freeze in an otherwise strightforward development agreement, via sleight of hand, well beyond the scope contemplated by the Development Agreement Statute.

10

We agree with the City that the doctrine of *ejusdem generis* applies. The doctrine attempts to reconcile incompatibility between specific and general words " 'so that all words in a statute and other legal instruments can be . . . construed together, and no words will be superfluous.' " (*Barrett v. Superior Court* (1990) 222 Cal.App.3d 1176, 1190-1191.) The rule accomplishes the purpose of giving effect to both the particular and the general words, by treating the general words as embracing only objects similar in nature or class to those objects enumerated by the preceding specific words. (*Mountain Air Enterprises, LLC v. Sundowner Towers, LLC* (2017) 3 Cal.5th 744, 754; *Barrett,* at pp. 1190-1191.) The City's construction is consistent with this rule. FC Pier's construction is not.

FC Pier argues that the City's approach ignores the definition of "law" and makes the phrase "*other* laws" meaningless. We are not persuaded. As explained, in the context in which it is used (the definition of "Change to Existing City Laws and Standards"), "other laws" refers to city laws of that same class (zoning, construction, environmental, and land use laws) that are first adopted by the City or the Port or by voter initiative after the DA Ordinance Effective date. In other words, the definition describes two categories of laws—changes to existing zoning, construction, environmental, and land use laws and other, similar laws that are first adopted in the future.

Nor is the City's interpretation inconsistent with the Development Agreement Statute (Gov. Code, § 65864 et seq.), as FC Pier insists. Here, it is undisputed that the development agreement provides that changes to zoning, construction, environmental, and land use laws will not apply to the project if they pose a defined conflict. Accordingly, nothing we state herein

11

should be construed as "threaten[ing] to upend" the Development Agreement Statute.[1]

We conclude that FC Pier's construction of this agreement is clearly erroneous. We need not reach the additional arguments raised in the parties' briefs, including FC Pier's challenge to the trial court's demurrer ruling on FC Pier's reformation cause of action.[2]

## DISPOSITION

The judgment is affirmed. The City is entitled to its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(2).)

---

[1] FC Pier filed a request for judicial notice of a number of other development agreements that the City and other municipalities have executed, as well as a "2022 Statewide Housing Plan." We deferred ruling on the request for judicial notice, which the City opposes. We now deny FC Pier's request because it has not demonstrated the relevance of these documents to the legal issues on appeal. (See *Doe v. City of Los Angeles* (2007) 42 Cal.4th 531, 544, fn. 4.)

[2] At oral argument, FC Pier argued, for the first time, that it should be given leave to amend its complaint. FC Pier did not address the issue of leave to amend in either its opening or its reply brief. FC Pier thereby forfeited the argument and we will not consider it. (*Daniels v. Select Portfolio Servicing, Inc.* (2016) 246 Cal.App.4th 1150, 1185, disapproved on another point by *Sheen v. Wells Fargo Bank, N.A.* (2022) 12 Cal.5th 905, 948, fn. 12.)

_____

BURNS, J.

We concur:

_____

SIMONS, ACTING P.J.

_____

WISEMAN, J.*

A164411

---

&ast; Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.