[Nos. H026888, H027166. Sixth Dist. Aug. 2, 2005.]

CITY OF KING CITY, Plaintiff and Respondent, v.
COMMUNITY BANK OF CENTRAL CALIFORNIA, Defendant and
Appellant.

914

## COUNSEL

Miller, Starr & Regalia, Richard G. Carlston, Basil S. Shiber, Sunny J. Knight; Noland Hamerly Etienne Hoss, James D. Schwefel, Stephen W. Pearson, Anne K. Secker; Law Offices of Joel Franklin and Joel Franklin for Defendant and Appellant.

Sinsheimer, Schiebelhut & Baggett and David Alan Juhnke for Plaintiff and Respondent.

## OPINION

**RUSHING, P. J.**—Officials of the City of King City (City) deposited some $4.4 million of funds under their control into the Community Bank of Central California (Bank), and then pledged the funds to the bank as collateral for a loan to a developer engaged in a redevelopment project under the supervision of the local redevelopment agency, Community Development Agency (Agency). The developer apparently defaulted on the loan, and Bank refused to return the funds to City, which then brought this action for a writ of mandate compelling Bank to do so. City alleged that the deposit consisted of "City general fund monies" and that the pledge was void for the reason, among others, that it "could not be, and was not, authorized" by the City Council (Council) or the City Agency Board (Board). Bank sought a continuance

to permit discovery into the circumstances surrounding certain actions by the Council, the Board, or both, which, in Bank's view, conferred authority on the mayor to make the pledge. Bank also sought to inquire into the origin of the deposited money, asserting that it may have come from Agency funds and not, as City alleged, City funds. The trial court denied the request for a delay to conduct discovery and categorically excluded oral testimony concerning the events at issue. After what amounted to a lengthy law and motion hearing, it ruled on the merits in City's favor. It reasoned that there was no effective Council authorization for a pledge of the funds because the minutes of Council meetings, on their face, reflected only an authorization to make a *loan* to the developer. The court ruled that even if evidence outside the minutes disclosed a broader intent, it would not assist Bank because such evidence was inadmissible. The court further concluded that discovery into the origin of the funds would be futile because City would be entitled to prevail even if the funds belonged to the Agency. The court therefore granted the petition and directed issuance of a peremptory writ requiring return of the funds to City.

We hold that the court committed prejudicial error in several respects. First, the duty asserted by City does not arise from any "office, trust, or station" occupied or assumed by Bank, and therefore will not support the issuance of mandate. (Code Civ. Proc., § 1085, subd. (a).) As a result, the matter should have proceeded as an ordinary civil action, with Bank entitled to the usual processes of discovery and trial. Second, the denial of discovery into the origins and ownership of the pledged funds was both erroneous and prejudicial because evidence that the funds belonged to the Agency would tend to defeat City's claims as pleaded, refute its claimed entitlement to an extraordinary writ, and support an inference (among others) that the ambiguous measures in question were adopted by the Agency and were intended to authorize an expenditure on its behalf, not City's. Third, the court's categorical denial of discovery and exclusion of evidence on the ground that it violated the "deliberative privilege" of legislators likewise constituted prejudicial error because it went beyond barring inquiry into the subjective thoughts and motives of legislators to exclude perfectly proper objective indicia of legislative intent, including the circumstances of the enactments in question and what actually took place at public meetings where those enactments, or matters related to them, were publicly discussed and adopted. In the absence of a statute requiring a more specific recital in the minutes (or other specified public record), courts faced with the interpretation of a municipal enactment are as free to consult evidence of legislative intent as when they interpret state or federal legislation. In this regard, the trial court further erred by adopting City's misreading of certain statutes, which require a "recorded vote" on spending measures, so as to render such a measure entirely invalid unless it is set down in detail on the face of the minutes.

Given these conclusions, we will reverse the judgment along with a postjudgment order awarding attorney fees to City.

BACKGROUND

A. *Creation and Pledge of Certificate of Deposit*

At all times relevant here, the Council and the Board shared the same members and sat jointly at combined meetings, often without clearly distinguishing between the two entities when measures were considered and adopted. The proceedings of both entities were conducted under a single combined agenda and were memorialized in a single set of minutes. Because many of the resulting ambiguities remain unresolved at this stage, we will sometimes refer to these entities by the inelegant terms "City/Agency" and "Council/Board," by which we mean both to acknowledge the ambiguities presented and to disclaim any attempt to resolve them on the present incomplete record.

At a meeting on February 8, 2000, the Council/Board considered a staff proposal to authorize a loan from the King City Revolving Loan Fund (KCRLF) to Town Square Partners LLC (TSP), the developer of a redevelopment project previously authorized by City and the Agency. The staff's overall report for the meeting was accompanied by a special report authored by D. Scott Galbraith, Director of the Economic Development Department, concerning the loan proposal. It stated that the purpose of the loan was to fund tenant inducements, developer profit, and financing costs, as well as to provide capital for TSP. The report stated that the loan would be accomplished either by "advanc[ing] funds directly" from KCLRF, or by *"extend-[ing] funds to capitalize a loan from a private lender."* (Italics added.) The Council and Community Development Agency Minutes of the February 8, 2000 meeting recite that the proposal appeared on the consent agenda, and was approved.

In anticipation of the regular meeting of the City/Agency on March 14, 2000, staff presented an agenda item numbered 5.3, as follows: "CONSIDER AND ACT—Terms and Conditions for a Revolving Loan to Town Square Partners LLC. [¶] Staff report in the Addendum." The pertinent report was again prepared by Galbraith, and contained a recommendation "That the Terms and Conditions of the King City Revolving Loan Fund to Town Square Partners LLC be approved." Attached to the report was a two-page list of "Terms and Conditions," again containing the recital, "KCRLF will advance funds directly, *or extend funds to capitalize a loan* from a private lender."

(Italics added.) The attachment showed project funding from a "1st Note" of $4,574,193, and a "2nd Note—KCRLF" of $3,822,638.[1]

The Council and Community Development Agency Minutes for the meeting of March 14, 2000, recite the following action with respect to the above agenda item: "CONSIDER AND ACT Terms and Conditions for a Revolving Loan to Town Square Partners LLC [¶] Scott Galbraith mentioned that most of the items on the agreement had been previously approved by the Agency Board. On motion by Agency Boardmember Grebmeier, seconded by Agency Boardmember Zechentmayer, the Agency Board approved the Revolving Loan to Town Square Partners with the following staff recommendations and also added Deputy City Clerk approval to the process: [¶] 1. Approve a loan for up to $3,850,000 to Town Square Partners LLC from the King City Revolving Loan Fund. The loan amount may vary, and shall be increased to cover potential legal settlement expenses. [¶] 2. Finance Director to identify accounts and allocate funds to support KCRLF. [¶] 3. A Deed of Trust to secure the KCRLF loan or line of credit shall be recorded, subordinate to principal financing. [¶] 4. Town Square Partners LLC shall provide a promissory note to secure the KCRLF loan prior to construction completion of the Town Square project."

In early April, 2000, Robert Moreno, who according to Bank was City's treasurer and finance director, signed a certificate of deposit placing $3,822,638 into an interest-bearing account with Bank. The account had a maturity date of April 4, 2002, but was "Automatically Renewable." Around this same time, John Myers signed, as "Mayor of City of King," an assignment of deposit account stating that City, as grantor, assigned to Bank, as lender, a security interest in the certificate of deposit account, as collateral for a debt incurred by TSP to Bank under a note made on April 3, 2000, in the amount of $3,822,638.

Five months later the matter again came before the Council/Board. In preparation for the regular meeting of September 12, 2000, staff submitted a report including the following agenda item: "5.9 APPROVAL of amendment of accounts and deposit of additional funds in support of the Town Square Project. [¶] Refer to staff report on Addendum, page 75. A detailed review of the report will be provided at the council meeting." A report by Galbraith, dated August 14, 2000, stated in part, "A $3.85 million loan . . . from the King City Revolving Loan Fund to Town Square Partners was approved and processed in May 2000. The purpose of the loan was to fund non-construction expenses (i.e. tenant inducements, financing costs, etc.). It was noted at the time that the loan amount was variable. [¶] The loan was

---

[1] TSP had secured a separate construction loan, which is at most peripheral to the issues on appeal.

requested to be established as a 'revolving line of credit. . . .' The lender arranged a traditional loan. [¶] The tenant inducement budget for Town Square totals $675,000. A large portion of this budget ($375,125) was to be derived from the Hartnell College project (i.e. land, demolition, relocation, etc.). The initial allocation for tenant inducement was $ 270,000, which has been exceeded. An amendment to the KCRLF loan is required. [¶] Building permit and mitigation fees have been added to the project cost. . . . [¶] The net loan has increased to $3,958,850. However, the loan structure requires an amendment to reflect a $4.4 million loan. [¶] RECOMMENDATION: [¶] 1. That staff be authorized and directed to increase collateral, and amend the KCRLF loan to $4.4 million. [¶] 2. That staff be authorized and directed to amend the allocation of loan funds . . . ."

The minutes for the meeting of September 12, 2000, describe the following action: "APPROVAL of amendment of accounts and deposit of additional funds in support of the Town Square Project. [¶] On motion by Councilmember Grebmeier, seconded by Councilmember Tamez, Council approved the amendment of accounts and deposit of additional funds in support of the Town Square Project."

On or about November 3, 2000, the mayor signed a new assignment of deposit account, which appears to be substantially identical to the earlier one except that the amount of the principal is stated to be $4.4 million.

Some time later, concerns apparently arose about TSP's ability or willingness to repay the loan. City made known to Bank its intention to "redeem the above CD on the maturity date," and an attorney for Bank replied that the certificate secured TSP's debt to Bank, that Bank was "not willing to extend [TSP's] loan any further," and that if TSP "fails to pay the Bank on April 3 when the loan is due, the Bank will take action to realize on the collateral."

B. *Proceedings Below*

On April 2, 2003, City filed its petition for writ of mandate. Although the petition referred to "CDA," apparently an abbreviation for Agency, it was brought solely on behalf of City. In it, City repeatedly characterized the funds at issue as "City general fund monies" or "general fund monies," and alleged that the purported assignment for purposes of collateral was "void as a matter of law" because (1) it constituted "an *ultra vires* act which could not be, and was not, authorized by the City Council or CDA"; (2) it constituted "an illegal gift of public funds under California Constitution, Article XVI, section 6"; and (3) it violated conflict of interest statutes (see Gov. Code, §§ 1090,

87100 et seq.).[2] The petition prayed for a writ of mandate directing Bank "immediately to return to City the $4.4 million in general fund monies," plus costs and attorney fees.

Bank initially neglected to file a formal response to the petition, but filed an opposition memorandum contending that mandate was not a proper remedy because City had failed to show, among other things, that Bank had a ministerial duty to return the funds. Bank further contended that City's arguments on the merits were unsound in various respects.

The hearing on the petition was apparently continued to May 15, 2003, and then to May 22, 2003, over City's objection, at the request of Bank's counsel. On May 19, Bank filed a demurrer on the ground that the petition "fail[ed] to state facts sufficient to constitute a cause of action for issuance for a writ of mandate in that Petitioner has other plain, ordinary and adequate remedies . . . ."[3] City requested that the demurrer be overruled on the grounds that (1) it was untimely, in that Bank should have been served a response to the petition by May 8, 2003; and (2) Bank failed to provide adequate notice, in that the notice of demurrer purported to set a hearing date of May 22, 2003, only three days after it was filed and served.[4]

The matter came on for hearing on May 22, 2003. After denying Bank's request for a continuance to conduct discovery (see pt. II, *post*), the court turned to Bank's demurrer, which it "deemed untimely," but ruled, "Previous response filed by defense is deemed to be a combined demurrer and verified response."

---

[2] Although the petition states no facts in support of the conflict of interest claim, that claim apparently rested on the premise that a member of the Council/Board had a disqualifying interest in Bank. The trial court did not reach that theory, which has no bearing on this appeal.

[3] The essential defect asserted by Bank was not that City had failed to plead any basis for relief but that it had prayed for relief to which it was not entitled. A general demurrer cannot be sustained unless the complaint fails to state a cause of action for any form of relief (*Di Lorenzo v. Stewart Title Guaranty Co.* (1965) 232 Cal.App.2d 839, 843 [43 Cal.Rptr. 261]) "under any possible legal theory" (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967 [9 Cal.Rptr.2d 92, 831 P.2d 317]). Nor will a demurrer lie against a prayer. (5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 910, p. 370.) The primary device for reaching pleading defects that are not susceptible to demurrer is a motion to strike. (*Id.* § 966, p. 430.) By electing to entertain Bank's challenge on the merits, the court effectively deemed the demurrer a motion to strike the prayer.

[4] The untimeliness of a demurrer is a ground to strike it, not overrule it. (See *Buck v. Morrossis* (1952) 114 Cal.App.2d 461, 464–465 [250 P.2d 270]; *Tuck v. Thuesen* (1970) 10 Cal.App.3d 193, 196 [88 Cal.Rptr. 759], disapproved on another point in *Neel v. Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 190, fn. 29 [98 Cal.Rptr. 837, 491 P.2d 421]; 5 Witkin, *supra*, Pleading, § 932, pp. 391–392.) In the face of such an objection, the trial court may elect in its discretion to entertain the demurrer, allowing the aggrieved party more time, if necessary, to respond. (5 Witkin, *supra*, Pleading, § 932 at p. 392.) Again the point is moot because the court entertained the "demurrer" on the merits.

The court then entertained lengthy arguments on the issues raised by the petition. In connection with the question whether the pledge was ultra vires, counsel for Bank informed the court that he had "some witnesses under subpoena to help elucidate the Court on those issues." Among the witnesses was Scott Galbraith, who according to counsel would testify if called that when he referred to "capitaliz[ing]" a loan in his report to the Council/Board, "he mean[t] to say collateralize a loan from a private lender."[5] However, the court opined that extrinsic evidence was probably inadmissible to "inquire into what they [i.e., the Council/Board] meant when they took their actions," adding, "I think that might be a quick way to proceed. So I'm not inclined to let oral testimony in." Counsel for Bank noted that it had "people under subpoena" and was uncertain how to proceed. The court suggested that counsel "release them at this time, but obviously if I determine that you can present oral testimony and that the Court wants to hear that in order to decide, we can then allow you the time to re-subpoena them and bring them in." The court never authorized Bank to call witnesses.[6]

At the continued hearing on June 11, 2003, the court first overruled Bank's demurrer, implicitly concluding that City had established, or that the allegations of the petition were sufficient to establish, the conditions for relief by mandate. It then entertained lengthy arguments on City's objections to Bank's evidence, particularly the applicability of the "deliberative privilege" to Bank's efforts to bring extrinsic evidence to bear on the official actions under scrutiny. Counsel for Bank argued that under *Carruth v. City of Madera* (1965) 233 Cal.App.2d 688 [43 Cal.Rptr. 855] (*Carruth*), the court should look beyond the words of a vague enactment to determine what City had actually done. Counsel for City questioned the applicability of that case and its viability in light of *County of Los Angeles v. Superior Court* (1975) 13 Cal.3d 721 [119 Cal.Rptr. 631, 532 P.2d 495]. (See pt. III.A, *post.*)

---

[5] As will appear in part III.A, *post*, a staff member's testimony as to a meaning *privately* attached to terms used in legislation is obviously not relevant to establish legislative intent. However, evidence that this meaning was *communicated to the legislative body* at or prior to the time of enactment *is* relevant and may well be admissible, at least where the purpose is to explain and illuminate a patently ambiguous enactment and not to impeach an otherwise valid one or alter a plain meaning otherwise facially apparent.

[6] City contends that Bank waived the right to present oral testimony by failing to comply with the law and motion rules applicable to such requests. (See Cal. Rules of Court, rule 323.) As City acknowledges, those rules were made arguably applicable only by City's claimed entitlement to relief by extraordinary writ. (Cal. Rules of Court, rule 303(a)(2).) We are unimpressed by the notion that a plaintiff can cut off the procedural prerogatives to which an ordinary civil defendant is entitled merely by filing a complaint praying for relief to which, as we conclude in part I, *post*, it was not entitled. In any event, the trial court denied the request for oral testimony on the merits and on the merits that ruling must stand or fall.

The court distinguished *Carruth* on the ground that it involved no statute requiring a specific public record of the challenged action. The court appeared to find such a requirement here by virtue of Government Code sections 36935 and 36936. (See pt. III.A, *post.*) It ruled inadmissible oral testimony concerning what council members "meant" or "understood when they enacted the minute order of February 8th . . . to interpret that." It also ruled that transcripts of public Council/Board meetings were inadmissible both on grounds of hearsay and as violating "deliberative privilege." (See fn. 24, *post.*)

The court then announced its decision that "the action taken on the consent agenda doesn't comply with Government Code section 36935 in that resolution or orders for the payment of money shall be adopted or made only at a regular meeting or at a special meeting for which the notice of such special meeting specifies the business to be transacted." It found the recital in the minutes of February 8, 2000, insufficient to satisfy the supposed statutory requirements because the minutes only said that the Council/Board "authorize . . . King City revolving loan fund to Town Square Partners L.L.C.," and because "it's unclear whether the city's acting or the agency is acting." After raising a host of other supposed impediments to Bank's position, some seemingly on its own motion (see pt. IV, *post*), the court concluded that "the city prevails on its first argument that the action was ultra vires. . . . [I]f it's ultra vires it's a gift of public funds . . . ."

A judgment duly followed, from which Bank took appeal No. H026888. Eventually the court entered an order awarding City its attorney fees, from which Bank took appeal No. H027166. Upon the parties' stipulation, we ordered the two appeals consolidated for briefing, argument, and decision.

## I. *Failure to Establish Mandatory Duty*

■ Mandate is the principal extraordinary writ surviving under California law. It issues "to any inferior tribunal, corporation, board, or person, to compel the performance of an act which the law *specially enjoins*, as a *duty resulting from an office, trust, or station* . . . ." (Code Civ. Proc., § 1085, subd. (a), italics added.) It is said that the writ rests in the discretion of the issuing court, but becomes a matter of right when the plaintiff shows that "there is not a plain, speedy, and adequate remedy, in the ordinary course of law." (Code Civ. Proc., § 1086; *May v. Board of Directors* (1949) 34 Cal.2d 125, 133–134 [208 P.2d 661].) As bearing on the present discussion, the substantive requirements for issuance of the writ are "(1) a clear and present ministerial duty of the defendant to do an act which the law specially enjoins (Code Civ. Proc., § 1085; *Faulkner v. California Toll Bridge Authority* (1953) 40 Cal.2d 317, 326 [253 P.2d 659]), and (2) a substantial

beneficial interest of the plaintiff in the performance of that duty (Code Civ. Proc., § 1086; *Parker v. Bowron* (1953) 40 Cal.2d 344, 351 [254 P.2d 6])." (*Flora Crane Service, Inc. v. Ross* (1964) 61 Cal.2d 199, 203–204 [37 Cal.Rptr. 425, 390 P.2d 193]; cf. *Thorning v. Hollister School Dist.* (1992) 11 Cal.App.4th 1598, 1603 [15 Cal.Rptr.2d 91].)

The duty asserted by City is for Bank to return the funds deposited with and ostensibly pledged to it by City officials. Bank does not deny that if this duty exists, City has a substantial beneficial interest in its performance.[7] The principal points of controversy are whether the asserted duty is "ministerial," whether it is plain, and whether City has a "plain, speedy, and adequate remedy, in the ordinary course of law." (Code Civ. Proc., § 1086.)

■ A "ministerial duty" is one generally imposed upon a person in public office who, by virtue of that position, is obligated "to perform in a prescribed manner required by law when a given state of facts exists. [Citation.]" (*Alliance for a Better Downtown Millbrae v. Wade* (2003) 108 Cal.App.4th 123, 129 [133 Cal.Rptr.2d 249]; see *Kavanaugh v. West Sonoma County Union High School Dist.* (2003) 29 Cal.4th 911, 916 [129 Cal.Rptr.2d 811, 62 P.3d 54] [defining "ministerial act"].) Obviously, neither Bank nor any of its agents occupies a public office in any normal sense. City emphasizes that *it* is a public entity, but we fail to see how an entitlement to mandate can be held to arise from the *claimant's* status. The statute conditions the right to such relief on a clear ministerial duty owed by the *defendant*.[8]

---

[7] We note that if the pledged funds belonged in law to the Agency, it might be supposed that it was the Agency and not the City that had a clear beneficial interest in their return. We do not understand Bank to have ever raised this point, however. Nor has it suggested that, regardless of the ownership of the funds, the Agency might be a necessary party to this action, whose joinder should be required, because this proceeding may invalidate actions arguably taken by the Agency, or impair interests arguably vested in it.

[8] Even when the defendant is a public entity, mandamus generally will not lie to enforce a contractual duty: "As a general proposition, mandamus is not an appropriate remedy for enforcing a contractual obligation against a public entity for at least two reasons. The first is that contracts are ordinarily enforceable by civil actions, and the writ of mandamus is not available unless the remedy by civil action is inadequate. (Code Civ. Proc., § 1086; *McPherson v. City of Los Angeles* [(1937)] 8 Cal.2d 748 [68 P.2d 707].) The other is that the duty which the writ of mandamus enforces is not the contractual duty of the entity, but the official duty of the respondent officer or board." (*Wenzler v. Municipal Court* (1965) 235 Cal.App.2d 128, 132–133 [45 Cal.Rptr. 54]; see *Shaw v. Regents of University of California* (1997) 58 Cal.App.4th 44, 52 [67 Cal.Rptr.2d 850]; *State ex rel. Russell v. Duncan* (1992) 64 Ohio St.3d 538 [597 N.E.2d 142, 143] [affirming dismissal of private depositor's mandamus action against bank; relationship was contractual, and action on contract was an adequate remedy, precluding mandamus].) Here the contract may ultimately be held unenforceable due to limitations on the power of local governments, but even if that occurs it will have no tendency in logic to convert the bank's duty from one sounding in contract to one arising from an office, trust, or station. At most it would justify imposition of a *constructive* trust—a potentially misleading term here, because it describes not a status but a *remedy* awardable in a civil action.

■ It is true, however, that mandate will sometimes lie against a private person to compel performance of a duty. Most typically, it is available to force the disclosure of records or the performance of similar duties owed to shareholders or other principals by a corporate officer or similar functionary. (E.g., *Johnson v. Langdon* (1902) 135 Cal. 624, 626 [67 P. 1050] [mandate is "the appropriate remedy of the stockholder in case of a refusal of the statutory right" to inspect corporate records]; *Most v. First Nat. Bank of San Diego* (1966) 246 Cal.App.2d 425 [54 Cal.Rptr. 669] [following *Johnson*]; *Hobbs v. Tom Reed Gold Mining Co.* (1913) 164 Cal. 497, 499 [129 P. 781] [mandate lay to enforce shareholder's right to inspect corporation's gold mine; "the defendants occupy the position of official trustees from which duties may arise to perform acts on behalf of the plaintiff"]; *Potomac Oil Co. v. Dye* (1909) 10 Cal.App. 534, 537 [102 P. 677] [mandamus lay to compel former secretary to surrender documents to successor; noting distinction between duties arising from contract and those arising from corporate bylaws].) The cases cited by City are all substantially of this same character. (See *Irrigation District v. Wutchumna W. Co.* (1931) 111 Cal.App. 688, 693 [296 P. 933], quoting *Miller v. Imperial Water Co. No. 8* (1909) 156 Cal. 27, 30 [103 P. 227] [right of stockholder in mutual water company to receive water " 'is not based on any special contract entered into by him with the corporation, but is an inseparable adjunct of his membership, and it is a plain duty resting on the corporation in the exercise of its corporate functions to furnish him such water' "]; *Allen v. Los Angeles County Dist. Council of Carpenters* (1959) 51 Cal.2d 805 [337 P.2d 457] [restoration of union membership; petition denied on the merits]; *Stabler v. El Dora Oil Co.* (1915) 27 Cal.App. 516, 522 [150 P. 643] [duty of corporate directors to convene shareholder meeting; governing bylaw "prescribe[d] a duty to be performed by the board of directors thereof in the interest of justice to and for the benefit of the stockholders"]; *Liberal Catholic Church v. Rogers* (1944) 65 Cal.App.2d 196, 199, 200 [150 P.2d 486] [action to compel former officer of nonprofit corporation to turn over corporate materials; venue properly transferred because underlying duties arose not from contract but from "defendant's legal duty as a former officer of plaintiff corporation"; materials were "entrusted" to her "as the secretary and treasurer of plaintiff"]; see also *Anton v. San Antonio Community Hosp.* (1977) 19 Cal.3d 802, 817, fn. 15 [140 Cal.Rptr. 442, 567 P.2d 1162] [marshaling cases into those involving corporate officers, union officers, social and fraternal societies, and professional societies].)

■ All of these cases are readily understood as resting on a duty arising from "an office, trust, or station," albeit a private one. (Code Civ. Proc., § 1085.) City has never identified any such "office, trust, or station" occupied by Bank in connection with the account here at issue. Instead it seeks to bypass that statutory language by conflating *clear* duty and *statutory* duty, on

the one hand, with *ministerial* duty (i.e., a duty arising from an office, trust, or station), on the other. Mandate obviously will not lie to enforce every duty arising from a statute, no matter how clear the duty may be. No one would suggest that mandate is available against a speeding motorist, a seller of narcotics, a fraudulent advertiser, or a poacher of game, though all might be violating clear statutory duties. To establish a right to mandate the petitioner must show that the defendant is under a duty arising from his or her *status* as holder of an office, trust, or station.

■ Further, the statutes on which City relies for its claim of a duty enforceable by mandate do not apply to the account at issue here.[9] Government Code section 53642 (section 53642) provides, "The money deposited may be drawn out by check or order of the treasurer or other official authorized to make such deposit." Government Code section 53644 (section 53644) provides, "If an agreement is not made: [¶] (a) Active deposits and interest thereon are subject to withdrawal upon the demand of the treasurer or other authorized official, subject to any penalties which may be prescribed by federal law or regulation. [¶] (b) Inactive deposits are subject to notice of at least thirty days before withdrawal." Both provisions are nearly meaningless by themselves; they can only be understood if read in context. The context is largely supplied by Government Code section 53635.2—not mentioned in City's brief—which provides for the deposit of local agency funds in qualifying financial institutions "for safekeeping."[10] All of these statutes are descended from the Depositary Act, the purpose of which was to excuse local governments from the requirement under former law that all funds on hand be "held intact in public treasuries." (*Pomona City School Dist. v. Payne* (1935) 9 Cal.App.2d 510, 513 [50 P.2d 822].) With the adoption of the

---

[9] In addition to the two statutes discussed here, City cites Government Code section 53630.1, which recites that "the deposit and investment of public funds by local officials and local agencies is an issue of statewide concern." As a declaration of legislative *policy*, it cannot be understood to impose an enforceable duty on anyone.

[10] Government Code section 53635.2 provides, "As far as possible, all money belonging to, or in the custody of, a local agency, including money paid to the treasurer or other official to pay the principal, interest, or penalties of bonds, shall be deposited for safekeeping in state or national banks, savings associations, federal associations, credit unions, or federally insured industrial loan companies in this state selected by the treasurer or other official having legal custody of the money; or may be invested in the investments set forth in Section 53601. To be eligible to receive local agency money, a bank, savings association, federal association, or federally insured industrial loan company shall have received an overall rating of not less than 'satisfactory' in its most recent evaluation by the appropriate federal financial supervisory agency of its record of meeting the credit needs of California's communities, including low- and moderate-income neighborhoods, pursuant to Section 2906 of Title 12 of the United States Code. Sections 53601.5 and 53601.6 shall apply to all investments that are acquired pursuant to this section."

At the time of the deposits here, materially similar language appeared in Government Code section 53635. (Stats. 1999, ch. 644, §§ 2, 2.5; see Stats. 2000, ch. 1036, § 3; Stats. 2001, ch. 57, §§ 6, 8.)

Depositary Act, cities were no longer obliged to hold their idle funds fruitlessly—and perhaps hazardously—in the public treasury. (*Ibid.*) The statutes before us are intended to permit local officials to place liquid funds into banks "for safekeeping" pending their expenditure.

Where a deposit is made pursuant to these statutes, the receiving bank may well be under a ministerial duty to release the deposited funds upon lawful demand. If so, the ministerial character of that duty would arise not from the statutes cited by City but from Government Code section 53636, which declares that "Money so deposited [i.e., pursuant to Government Code section 53635.2] is deemed to be in the treasury of the local agency." This language supports an argument that where a bank accepts funds "for safekeeping" under these statutes, it assumes the constructive status (or "station"), for at least some purposes, of an officer or trustee of the municipal treasury.[11] In that view, its duty to release the funds upon proper demand is enforceable by mandate, just as mandate would lie against a city treasurer who refused to obey a valid disbursement order from a city council.

This, however, was not shown to be such a case. Although the burden was squarely on City to affirmatively demonstrate the presence of conditions justifying the extraordinary remedy of mandate, it made no attempt to establish that the funds in question were deposited with Bank "for safekeeping." There is no testimony by the treasurer or any other City official that anyone intended the funds to be held by Bank as ordinary City assets, let alone assets subject to withdrawal on demand. On the contrary, such evidence as appears in this record suggests the opposite—that everyone concerned intended the deposit to be placed at risk as security for a loan by Bank to a third party. That purpose may fail for reasons of law, but that hypothetical failure furnishes no basis to treat the transaction as a deposit "for safekeeping" when all evidence is to the contrary. Under City's abridged reading of the statutes, local agencies would apparently enjoy a peremptory right to immediate possession of any money they might deposit in a bank for any purpose, under any circumstances. The Legislature presumably has the power to create such a regime—effectively *preventing* municipalities from depositing funds for other purposes—but it has not done so. Sections 53642 and

---

[11] Although the point appears academic, some sister state authority supports the proposition that a bank assumes this status as a matter of common law *when it agrees to act in lieu of the public treasury*. (See *Hogansville Banking Co. v. City of Hogansville* (1923) 120 S.E. 604, 607 [156 Ga. 855] ["By accepting the appointment of depository for the city of Hogansville, and by acting as its de facto treasurer, the bank undertook to discharge a public duty; and mandamus is the appropriate remedy to enforce this public duty"]; cf. *Claxton State Bank v. R. S. Armstrong & Brother Co.* (1938) 195 S.E. 418, 419 [185 Ga. 487] [error to issue mandamus against bank without trial, where bank "expressly allege[d] that '[it] is not county depository charged with the duties of a county treasurer, and has not at any time been acting as such depository, and has never accepted appointment as county depository' "].)

53644 are limited by their terms to conditions not shown to be present here. For that reason alone, City failed to establish an entitlement to relief by writ of mandate, and the trial court erred by issuing such relief.

It might be suggested that a complete reversal could be avoided if the only prejudice resulting from the error were issuance of the wrong form of relief. In such a case we could conceivably reverse with directions to recall the writ and enter an amended judgment for civil damages. Whatever the theoretical availability of such a result, however, it cannot be obtain here because the summary nature of the proceeding deprived Bank of the opportunity to adequately prepare and present a defense, and because on the record before us the City also failed to establish a clear entitlement to relief.

## II. Denial of Discovery

### A. Background and Introduction

At the first full hearing on May 22, 2003, counsel for Bank requested a continuance on the ground that more time was needed for discovery. He stated that he had already "discussed with the Court and counsel in a telephone conference several days ago" a request "to postpone or delay this hearing or reset it to give the Bank sufficient opportunity to do the discovery that we think is appropriate [and] to which we're entitled in this proceeding." In addition to depositions of city officials, to which counsel for City had objected on grounds of "deliberative privilege," counsel for Bank noted that he had sought relevant documents from City but had received no written response, and that while some documents had been provided, others had not. Counsel for City asserted that no formal discovery request had been served, but counsel for Bank replied that Bank had served deposition notices coupled with document requests, and that while some materials had been produced, entire categories of documents had not. He asserted an entitlement "to have those documents and have them submitted under oath or have a response under oath in the discovery process that there is no other document . . . . I think we're entitled to know what happened here." He said that there was a "rush to judgment" underway, and that there was "no significant risk to the City in allowing the Bank to do some reasonable pre-hearing discovery."

■ The court denied the request for a continuance to conduct discovery. This ruling was vested in the trial court's discretion, and can only be overturned if that discretion was abused. (*Save Open Space Santa Monica Mountains v. Superior Court* (2004) 84 Cal.App.4th 235, 245–246 [100 Cal.Rptr.2d 725].) " 'Where there is a basis for the trial court's ruling and the evidence supports it, a reviewing court will not substitute its opinion for that of the trial court. [Citation.]' [Citation.] The trial court's determination will be

set aside only when it has been established that there was no legal justification for the order granting or denying the discovery in question." (*Ibid.*, quoting *Johnson v. Superior Court* (2000) 80 Cal.App.4th 1050, 1061 [95 Cal.Rptr.2d 864].)

We have concluded that there was no legal justification here for the denial of a continuance to permit discovery, which ruling therefore constituted an abuse of discretion, with the prejudicial effect of rendering the entire proceeding unfair and the result unreliable. In discussing the point we will largely confine ourselves to counsel's request for discovery into a single issue of fact—the status, origins, and ownership of the funds deposited into the subject account and ostensibly pledged by the mayor. Counsel for Bank repeatedly emphasized that the source of the funds was not adequately demonstrated by any documents voluntarily produced by City, but noted indications that the funds were not "City general fund monies," as alleged in the complaint, but *Agency* funds. As will appear, the refusal to permit discovery into this issue cannot be justified by any rule of law. By focusing on that refusal, we do not intend to suggest that the court properly denied discovery on other subjects. For instance, as our discussion elsewhere will indicate, the court's view of the admissibility of evidence of legislative intent was unduly constrained; that view inevitably reinforced its denial of discovery. (See pt. III.A, *post.*)

### B. *Specification of Materials Sought*

■ City opposed Bank's request for a continuance to conduct discovery on the ground, among others, that Bank never identified any specific evidence it lacked. Such an argument is highly suspect to say the least. We recognize that civil litigators earn large sums developing and then litigating over novel grounds for resisting discovery, but we see no colorable merit in the notion that the proponent of discovery may only obtain information he already has. Had Jefferson applied a similar test to Lewis and Clark's proposed expedition, American history might have been quite different. The pertinent term is "discovery," not "confirmation." A party is generally entitled to discovery upon a showing, not that he knows what he will find, but that it is reasonable to expect the proposed discovery to yield pertinent and otherwise admissible evidence. (See Code Civ. Proc., § 2017.010; former Code Civ. Proc., § 2017, subd. (a), enacted 1956, repealed Stats. 2004, ch. 182.) Here it was entirely likely that depositions of the relevant actors would, if nothing else, lead to a better understanding of the municipal proceedings in question and ensure that Bank acquired all admissible materials bearing on interpretation of the enactments at issue.[12]

---

[12] As discussed in part III.A, *post,* inquiry into the *mental processes* of legislators is sharply restricted. It does not follow that all City functionaries, or even the legislators themselves, are

Moreover, Bank's attorney *did* identify specific evidence he lacked and sought. He repeatedly insisted that discovery was needed on the character and "source of the funds that were pledged." At the initial hearing he said that Bank had "requested from the City . . . documentary evidence . . . indicating where the money came from. What the Bank has in its records indicates that there was a transfer from . . . what's called the local agency funding account up in Sacramento. And it's on a City of King check. [¶] But the financial records, which we've placed before the Court, show that the City of King has a whole variety of funds. It also shows that—those records will also show that there never was at any one time $3.8 million in the general fund that we can identify. . . . It may have passed through. But the balance sheets don't show $3.8 million in the general fund. [¶] And I don't suggest . . . that we know where this money came from or whose money it was. I'm simply pointing out that that is another place where there's sort of a hole in the evidence, which probably could be filled out by some appropriate discovery or the provision of information about that."

At the continued hearing counsel again noted that "there is a question as to whether these are city funds." Indeed by this time he was able to make an offer of proof that an analysis of city financial records would reveal "that the money that was used to pledge was the proceeds of the 1998 redevelopment bond that was issued by the redevelopment agency." The court appeared to express skepticism at the notion that "[t]he mayor on behalf of the city pledged money that was agency money," but counsel replied, "That appears to be what they did. Again, we . . . haven't had the ability to take any depositions, we haven't got any of the backup data. We have analyzed the reports that we have been given by the city, financial reports, and we believe that's what it demonstrates. . . . [¶] . . . I think [if] we are allowed to do some discovery, we would be able to answer some of those questions much more

categorically immune from discovery into their knowledge of objective facts and circumstances where it may constitute or lead to admissible evidence. (See *City of Santa Cruz v. Superior Court* (1995) 40 Cal.App.4th 1146, 1148 [48 Cal.Rptr.2d 216] ["'[D]iscovery into the subjective motives or mental processes of legislators is forbidden, and . . . this proscription may not be circumvented by deposing others about the factors that may have led to the legislators' votes."]; *id.* at pp. 1152–1153 [exclusionary rule extends only to information "concern[ing] the subjective motives and thought processes of legislators"; if it concerns something else, "the legislative privilege does not apply"]; *id.* at p. 1155 [privilege applies "so long as the questioning goes to legislators' thought processes"]; *City and County of San Francisco v. Superior Court* (1975) 13 Cal.3d 933, 936 [120 Cal.Rptr. 730, 534 P.2d 426] [denying writ as premature where trial court had ordered county supervisors to submit to depositions but had not required them to answer objectionable questions; "[p]etitioners have cited no authority which goes so far as to grant local legislators an absolute privilege to refuse to appear at a deposition and reveal relevant information"]; *Board of Supervisors of Los Angeles County* (1995) 32 Cal.App.4th 1616, 1621, fn. 2 [38 Cal.Rptr.2d 876] [*City and County of San Francisco v. Superior Court, supra,* 13 Cal.3d 933, distinguished where pending deposition sought sheriff's testimony concerning his communications with legislators].)

clearly than we can now. But I believe what we can show from the financial reports of the city that were prepared by their outside auditors, this is allow [*sic*; probably "how"] the money moved through the system."

It simply is not the case that Bank failed to identify specific, discoverable evidence that it lacked and that could well be admissible as evidence.

### C. *Sufficiency of Existing Proofs*

At the time the court denied the request for additional time to conduct discovery, its only indicated basis for the ruling was an observation that counsel for Bank had already presented voluminous documents that, according to counsel, were sufficient to establish a valid pledge of municipal funds. The court then remarked, ". . . I don't see why you need a continuance for further discovery if that's already clear in what you've got here today."

■ The denial of discovery cannot be justified by such reasoning. A party's right to obtain evidence does not depend on counsel's willingness to make the concession—probably imprudent, possibly reckless, and perhaps even erroneous—that the evidence already available is insufficient to make a case. The propounder need only show that, given the known circumstances, the proposed discovery is "reasonably calculated to lead to the discovery of admissible evidence." (Code Civ. Proc., § 2017.010; former Code Civ. Proc., § 2017, subd. (a).) ■ A court has the power to protect a responding party against discovery that is "unreasonably cumulative or duplicative" (Code Civ. Proc., § 2019.030, subd. (a)(1); former Code Civ. Proc., § 2019, subd. (b)(1), enacted 1986, repealed Stats. 2004, ch. 182), but there was no occasion to exercise this power here. The question, therefore, was not what evidence Bank already had, let alone whether counsel thought it was sufficient (as the court found it was not), but whether discovery would produce *additional* admissible evidence.

### D. *Absence of Formal Discovery*

City contends that a continuance for discovery was properly denied because Bank "never propounded formal discovery to City." This assertion is closely accompanied by a citation to City's own "Objection to [Bank's] Notices of Depositions and Requests to Produce Documents." The objection lists nine depositions then scheduled for a four-day period commencing April 28, 2003. In its petition for rehearing, City explains that while Bank propounded discovery to "current or former City officials," it did not serve formal discovery directed to City as such or to its custodian of records, so designated. This distinction presumably provided City with a justification for failing to provide documents sought by Bank in response to these requests,

but it hardly effected a forfeiture of Bank's right to obtain such documents before an adjudication on the merits.

In any event, the trial court found no procedural forfeiture, but denied Bank's request on the ground that Bank did not need discovery and, later, that discovery would have not have helped it. Nor do we think a denial of discovery on a purely formal ground would have been a sound exercise of discretion under the circumstances then prevailing. City's unsound invocation of a right to mandate must have kept Bank and its attorneys under intense time pressure for the entire period from filing to judgment. The claims they were required to meet included not only those the court ultimately sustained, but others it did not reach, including that a member of the Council/Board had acted in violation of conflict of interest laws. In addition Bank had to meet City's motion—ultimately denied—to disqualify Bank's chosen attorneys on the ground that they were themselves burdened with a conflict of interest. By combining these concerted attacks with the successful invocation of a remedy to which it was not entitled, City managed to force a large and complex case to a precipitous resolution using law and motion procedures, even while it successfully resisted discovery and harried its opponent's flanks with unmeritorious procedural challenges. Under these circumstances, Bank must be allowed a certain lack of punctilio, at least for purposes of preserving core procedural challenges for appeal.

### E. *Materiality of Discovery Sought*

Ultimately the Court's refusal to permit discovery into the source of the funds at issue seemed to rest on the view that nothing Bank might discover in that regard would support a defense to City's claims. On the first day of hearing the court ruminated on the possibility that it could decide the central question—whether the pledge was duly authorized—without determining the source of the funds or even which entity, in contemplation of law, had pledged them.[13] Counsel for City gave impetus to this approach by arguing at the second hearing that an application of 1998 bond funds to secure the loan in question would violate the terms of the indenture relating to the bond. In its remarks at the conclusion of that hearing, the court apparently adopted that view. First it declared that monies "from the general fund . . . can't go to pay

---

[13] Although the court's remarks on this point are rather obscure, it acknowledged that by September 2000, City records made it "a little more clear that by then the city is aware and is taking action to increase a collateralized fund . . . ." However, the court immediately added, ". . . I think you could even argue *whether that's the agency acting or the city acting*, again not addressing your matter [i.e., the source of funds], the act is the same. *The funds are the same*." (Italics added.)

for redevelopment costs." Then, apparently quoting from the bond indenture, or an abstract of it, the court reached a similar conclusion about Agency funds: ". . . I would note [the provision] at page 17 . . . the agency will not mortgage or otherwise encumber, pledge or place any charge upon any of the tax revenues except as provided in the indenture [and] at page 20, it says the agency will adopt, make, execute and deliver any and all such further resolutions, instruments and insurance as may be reasonably necessary to carry out the intention or facilitate the performance of the indenture. [¶] So here again, they have to act by resolution. . . . [C]ontinuing on page nine, [it] talks about amendments permitted, certain amendments that would require the consent of the owners and other amendments that would not require the consent of the owners . . . , I don't see going to establishing the King City revolving loan fund as they have set it out. [¶] And more importantly, they have set out what this bond money is to be for in pages 24 and 25 where they outline the project. . . ."

In its statement of decision the court continued to describe the deposit as "City funds," but also reiterated the view that Agency ownership of the funds would have no effect on the outcome. In a footnote the court acknowledged Bank's contention that the funds "may not have been City funds," but declared the point unavailing because "the pledge of those funds as security for a loan to TSP is not one of the uses for which those bond funds were dedicated," and because "there is no formal authorization by [the Agency] for a pledge of those bond funds."

These comments do not provide a sound basis to deny discovery. To begin with, whatever its relevance to the merits of the controversy, the supposed status of this deposit as "city general fund monies" was the basis for City's claimed fulfillment of the statutory requirement that City have no "plain, speedy, and adequate remedy, in the ordinary course of law."[14] (Code Civ. Proc., § 1086.) The supposed status of the funds therefore furnished a necessary component of the City's case for a writ of mandate. It also provided the central ground for City's opposition to the continuances requested by Bank. Thus, by the repeated assertion of the "City general fund" status of the deposit, City succeeded in depriving Bank of the prerogatives ordinarily available to a civil litigant, not least of which was the right to

---

[14] City's attorneys wrote in their original memorandum that "the failure to return those funds will have an immediate detrimental effect upon the public treasury of the City," such that "there is no plain, speedy, or adequate remedy to prevent Bank's threatened conversion of those funds." Later counsel wrote that extraordinary relief was appropriate because "City seeks the immediate return of its $4.4 million in general fund monies, which in light of the current economic climate for governmental entities in California is crucial to City's economic survival."

conduct discovery for at least some months before any question of a trial would arise.[15]

Moreover, and more fundamentally, City *flatly alleged in its complaint* that it had "deposited $3,822,638 in *City general fund monies*." (Italics added.) Its whole right to recovery, not to mention an extraordinary writ, was premised on the allegation that this money *belonged to it*. If the money did not belong to it, City *could not prevail under the complaint as framed*. It could not avoid this result simply by arguing from uncited authorities that it could prevail under hypothetical facts on some other, unpled theory. Any evidence refuting City's claims *as pleaded* was not only material, but potentially dispositive—and eminently discoverable.

City cites the evidence it presented below "show[ing] that the money was general fund money." One might conceive in the abstract of evidence so compelling and conclusive on a given issue—such as an indisputable matter of public record, or a binding and conclusive admission by the propounding party—that a court would act within its discretion in denying discovery aimed at finding contrary evidence. That was hardly the case here. City's evidence consists of a passing averment by City Attorney Jencks that "[o]n April 4, 2000, City deposited $3,822,638 in City general funds into a Certificate of Deposit . . . at Bank." Jencks's own testimony shows that he was not competent to give this testimony over a proper objection. He declared that he had only become City Attorney on June 1, 2002—long after the transactions here at issue—and that his entire declaration was "based upon my *personal knowledge or my review of documents* from the City files . . . ." (Italics added.) The italicized disjunction exposes the entire declaration to exclusion on grounds of hearsay and lack of foundation. While Bank's failure to assert such an objection might permit the cited averment to sustain an otherwise unobjectionable finding of fact, it does not blind us to the extreme weakness of City's showing or the concomitant prejudice to Bank of refusing to permit discovery of the true facts of the matter.

Moreover, even if the characterization of the funds as "City money" came from someone with firsthand knowledge it would, standing alone, possess limited legal significance. For all we know it means nothing more than that the funds passed penultimately through a "general funds" account, or perhaps merely an accounting *characterization*, en route from the Local Agency

---

[15] In opposing Bank's request, counsel said City was "being hurt" because the certificate represented "City general fund money, $4.5 million dollars' worth." Counsel repeated this characterization of the funds at least four more times. The claim is repeated, albeit in a dramatically attenuated form, on appeal, where counsel for City writes that "the only admissible evidence shows that the Certificate held general fund money." But if this is "only admissible evidence" on the subject, that fact is the direct result of City's successful use of mandate procedures to prevent Bank from securing other evidence.

Investment Fund in Sacramento to the deposit account where they now rest. At oral argument counsel for City seemed unwilling or unable to say where the funds *came from*, as distinct from where they were *kept* immediately before they were turned over to Bank. But courts are quite familiar with the distinction between how assets are *held* and who actually *owns* them. They are used to resolving such issues under rubrics like formal versus beneficial title, tracing of assets, and so on. In such cases a key question is which party has the burden of proving the origin and true character of the funds at issue. Here that burden rested squarely on City, as plaintiff, and would have done so even in the absence of an express allegation that the deposit was "City general fund monies."[16] City apparently takes the position that it carried that burden merely by asserting that the funds were located in a City account, or under City custody and management, prior to their deposit in the Bank. But surely City was quite capable of disclosing the true history of the funds. Its persistent failure, indeed refusal to do so should have raised alarm bells as to the true nature and merits of its claims, at least as presently pleaded.[17]

Issues about the true ownership, source, or character of funds are rarely resolved merely by consulting the title on a given account or asset. In the absence of contrary authority—and City has offered none—we will not give dispositive effect to the label City chooses to attach to funds in its custody. (See *Auerbach v. Board of Supervisors* (1999) 71 Cal.App.4th 1427, 1438, 1439–1440 [84 Cal.Rptr.2d 592] [county's temporary transfers from various funds to cover general fund deficits were not invalid, and county was not obligated to pay interest therefore, even though the use of some funds was strictly limited by statute and others were bond proceeds earmarked for specific purposes]; *Ostly v. Saper* (1957) 147 Cal.App.2d 671 [305 P.2d 946] [where county intermingled funds deposited in interpleader action with its own funds, interest earned on interpleaded funds belonged to their owner, not county]; *Jarvis v. Bloodgood* (1972) 25 Cal.App.3d 694, 698 [102 Cal.Rptr. 212], quoting 16 Ops.Cal.Atty.Gen. 176, 179 (1950) [allocation of funds in

---

[16] More generally, City had the burden of proof as to *all* of the substantive issues before the trial court, including the fundamental question whether its treasurer and mayor were acting with authority when they deposited and pledged the funds at issue. Although the trial court never expressly suggested that the burden rested on Bank, the record is pervaded by a sense that City was entitled to prevail unless Bank demonstrated otherwise. This of course makes the categorical denial of discovery and exclusion of evidence all the more intolerable.

[17] We recognize that in this and other respects the trial court was led into error by City's kaleidoscope of ever-shifting claims, contentions, sidesteps, and deflections. Indeed City's presentation is reminiscent of that ancient chestnut of lawyer's folklore, the Story of the Goat, in which one neighbor complains of the depredations of a goat and the other seeks to deflect these claims by raising every conceivable contention, concluding triumphantly with, "And besides, it's not my goat!" Here City never stood on one point long enough for the point's weakness to become apparent to the trial court. Counsel for Bank contributed to the problem by not always identifying these weaknesses either, but his lapses may be excused to some extent by the extreme haste with which the matter was pressed forward to judgment.

budget is not binding on county; " 'Until the fund is irrevocably committed, the fact that it is carried on the county books under a particular name indicative of a hope or plan for future expenditure, is but a matter of administrative or bookkeeping convenience. Such a fund is available for the general purposes of the county' "].) For all this record shows, the City Treasurer was acting as ex officio financial officer of the Agency when he deposited the funds, and the mayor was acting in a similar capacity when he pledged them. (See *Metropolitan Water Dist. v. Adams* (1948) 32 Cal.2d 620, 622–623 [197 P.2d 543] [water district depositing funds in court in anticipation of condemnation was entitled to interest earned on funds while commingled with county treasury; "in making the bank deposits, the county treasurer was representing the court and, acting as the court's ex-officio treasurer, was depositing moneys belonging to the water district"]; *id.* at p. 627 ["To the county treasurer the court gave only actual custody, bare possession; it had no power to give the treasurer or the county the beneficial title to the money and such money still belongs to the water district"]; *id.* at p. 628 ["the county treasurer is in effect the treasurer of the court, an ex-offico officer, and holds the money for the court, not for the county"].) These matters cannot be resolved by speculating about how the constellation of possibly germane rules of law might apply to the multitude of colorable factual hypotheses. One of the virtues of discovery is that it facilitates a determination, on the best available evidence, of *what the facts really are*. This in turn renders more manageable, in number and complexity, the points of *legal* controversy.

Here, so far as the record shows, the court's consideration of the hypothesis that the deposit consisted of Agency funds degenerated into little more than guesswork about the law that might govern in such circumstances. Neither the court's oral comments nor its statement of decision reflect any consideration of specific legal restrictions on Agency expenditures other than those the court found in the 1998 bond indenture. But there was no competent evidence that the funds, if they were the Agency's, actually came from the 1998 bond; there was only an *offer of proof* to that effect, by Bank, in support of a plea for more time to ascertain the true facts. Moreover, assuming the funds came from the 1998 bond and the indenture imposed pertinent restrictions on the Agency's transfer of those funds, there was no competent evidence that Agency had failed to *comply* with those restrictions. Nor was authority offered for the necessary proposition that a noncompliant expenditure would be wholly void, so as to permit recovery from a third party who had incurred substantial detriment in reliance on the expenditure. There was no reason to believe that City, or for that matter the Agency, had *standing* to complain about the supposed violation of indenture terms. For that matter, since the Agency was not a party to the action, there had to be some

demonstration that City had standing to recover Agency funds. No attempt was made to establish any of these points.

Finally we reiterate that any theory that viewed the funds as Agency funds was *contrary to the allegations of the petition* and could not support issuance of a writ unless the petition were amended either formally or by stipulation, tacit or otherwise. This record cannot be interpreted to support a supposition that Bank acquiesced in a trial on the theory that the funds belonged to the Agency. Bank did not acquiesce in *any* trial, but desperately sought an opportunity to acquire the means to defend itself before the matter came to trial. The court could not adopt a theory outside the pleadings based solely on a colloquy with counsel, and then rely on that theory to enter a $4.4 million judgment in favor of a party who may well have had no legal right to pursue the claim.

### F. Circumstantial Evidence of City Ownership

Early in its statement of decision the court wrote that the Agency was required by law "to adopt an annual budget which is separate from City's budget, and to maintain separate bank accounts which are funded from specific appropriations and used solely for designated redevelopment purposes." The relevance of this statement is far from self-evident. It may be offered to support the proposition that if the funds were Agency funds, their expenditure in the manner indicated here was unlawful and void. If so, it fails, for all the reasons we have stated, to support the judgment. It may instead be intended, however, to support an inference that the pledged funds must *in fact* have belonged to City because they did not come from the Agency's budget, or were not used for "designated development purposes." The court may have drawn similar inferences from other objections to the hypothetical expenditure of Agency funds, as noted in the preceding subsection. If so the suggested inference is unsound for many reasons, of which the most prominent are: (1) Bank was precluded from conducting discovery on this very point; (2) inferential evidence, however strong, cannot justify the denial of discovery to obtain *direct* evidence on the same point; and (3) the factual premise (that the handling of the funds was inconsistent with legal requirements to which Agency was subject) is completely undemonstrated on this record.

The denial of a continuance to conduct discovery was a prejudicial abuse of discretion. Since it was only made possible by the fact that the matter was a proceeding in mandate, it also eliminates any possibility that the erroneous decision to permit the matter to so proceed might have been harmless.

III. *Failure to Establish Clear Duty*

A. *Sufficiency of Record of Authorizing Action*

The crux of the trial court's ruling on the merits was its conclusion that ". . . City action authorizing a pledge of public funds must be reflected in formal minutes or resolutions, and that testimony . . . concerning what was 'intended' or 'understood' by City officials is inadmissible to contradict or supplement those official records." The court found this rule fatal to Bank's case because "official minutes and resolutions contain no approval for, or discussion of, a pledge of City funds."

The supposed rule thus applied was drawn from two statutes. The first, Government Code section 36935 (section 36935), provides that "[r]esolutions or orders for the payment of money" may be adopted only at regular meetings or at special meetings with specific notice of the proposed measure. Government Code section 36936 (section 36936) provides, "Resolutions, orders for the payment of money, and all ordinances require a *recorded majority vote* of the total membership of the city council." (Italics added.) It is apparently City's view, which the trial court adopted, that even if the Council/Board plainly and explicitly voted in an open and duly noticed meeting to authorize a pledge of the funds question, these statutes rendered the action wholly ineffectual unless the clerk wrote down the terms of the measure thus adopted in the minutes.

No such rule can be extracted from the cited statutes, neither of which says anything about the degree of specificity with which the terms of a measure authorizing the payment of money must be recited in the minutes or anywhere else. Their only reference to recordation is the requirement of a "recorded majority vote" in section 36936. In this context, "recorded" may mean several different things.[18] In any event the term "recorded" modifies

---

[18] The lay meaning of the verb "record" in the context of voting is essentially to *cast* a vote in such manner that it is duly counted. (See 13 Oxford English Dict. (2d ed. 1989) p. 362 ["to give (a verdict or vote)"].) In the context of parliamentary procedure, however, "recorded vote" appears to be a term of art meaning a *method of voting* that requires each member to distinctly register his or her vote, or at least the fact that he or she voted. It is contrasted to, among other methods, a *viva voce* (live voice) vote, in which the votes of individual members often cannot be distinguished. (See Cong. Research Service, Guide to Legislative Process in House—Consideration <http://www.house.gov/rules/lph-consid2.htm> [as of Aug. 2, 2005] [four methods of voting in the House of Representatives are "the voice vote (*viva voce*), the division, the recorded vote, and the yea-and-nay vote"]; *ibid.* [recorded vote if duly requested and supported "is taken by electronic device. After the recorded vote is concluded, the names of those voting together with those not voting are entered in the Journal"]; cf. *ibid.* ["When the yeas and nays are ordered (or a point of order is made that a quorum is not present) the Speaker directs that as many as are in favor of the proposition will, as their names are called, answer 'Aye'; as many as are opposed will answer 'No.' The Clerk activates the electronic system or calls the roll and reports the results to the Speaker who announces it to the House"].)

"vote," not "resolution or order for the payment of money." The statutes are silent concerning the degree of specificity with which such a measure must be set out in the minutes or any formal instrument such as a resolution.

The Legislature has prescribed distinct formal requirements for the enactment of *ordinances*. (See Gov. Code, §§ 36931 [prescribing language for "[t]he enacting clause of ordinances"], 36932 ["Ordinances shall be signed by the mayor and attested by the city clerk."], 36933 [detailed requirements for public notice of proposed ordinances prior to enactment and publication afterwards "with the names of those city council members voting for and against the ordinance"].)[19] But City has cited, and we have found, no comparable requirements for other municipal enactments.

 Government Code section 36814 provides that a local council "shall cause the clerk to *keep a correct record* of its proceedings. At the request of a member, the city clerk shall *enter the ayes and noes* in the journal." (Italics added.) However this provision has been held "directory only," "not conclusive as to the proceedings of a city council," and not preclusive of "the introduction of evidence that the minutes do not reflect all of the proceedings of the council." (*Carruth, supra*, 233 Cal.App.2d at p. 693.) Moreover the statute does not purport to require that the terms of a resolution or order be set down in the minutes in haec verba, or with any stated degree of particularity.

---

The requirement of a "recorded vote" in section 36936 is no doubt intended to ensure some measure of accountability on the part of local legislators who approve (or refuse to approve) expenditures of public funds. (See generally *Kunec v. Brea Redevelopment Agency* (1997) 55 Cal.App.4th 511, 520 [64 Cal.Rptr.2d 143], quoting *Dry Creek Valley Assn., Inc. v. Board of Supervisors* (1977) 67 Cal.App.3d 839, 844 [135 Cal.Rptr. 726] ["There is a strong public policy 'that members of public legislative bodies take a position, and vote, on issues brought before them' "].) Arguably this objective is adequately served if members vote distinguishably at an open meeting, where interested parties may take note of their individual positions. However, it might be supposed that the objective of accountability is better served by requiring not only that votes be taken in a manner disclosing which members voted, but that the vote of each member be set down in a record accessible to the public. (See generally 5 McQuillen, Law of Municipal Corporations (3d ed. 2004) Municipal Records, § 14:5, pp. 15–16.) The parties have not briefed the question of what the term "recorded vote" actually means in the statute, and given the pervasiveness of unexplored factual issues we cannot even surmise whether the statutory requirement was satisfied here.

[19] Noncompliance with such requirements does not invariably result in invalidation of the affected enactment. (See *Pacific P. Assn. v. Huntington Beach* (1925) 196 Cal. 211, 221 [237 P. 538] [under earlier statute, signature by municipal officer was ministerial act and not condition to enforcement of ordinance]; cf. *id.* at p. 219 [contra, where signing officer has power of veto]; *Santa Rosa City R. Co. v. Central St. Ry. Co.* (1895) 38 P. 986 [4 Cal.Unrep. 950, 955–956] [ordinance treated as valid for 14 years would not be denied effect for absence of publication and properly formalized mayoral approval].)

 Government Code section 40801 requires the city clerk to "keep an accurate record of the proceeding of the legislative body and the board of equalization in books bearing appropriate titles and devoted exclusively to such purposes, respectively." However the Attorney General has opined, we think correctly, that this statute "does not require a verbatim account. Minutes recording the substance of the proceedings is all that section 40801 requires." (64 Ops.Cal.Atty.Gen. 317, 321 (1981).) Nor have we found any other statute requiring that a local legislative enactment be set forth at length in the minutes or, if it is not an ordinance, anywhere else. (Cf. Gov. Code, § 54957.2 [when local agency meets *in executive session*, officer or employee may be designated to "keep and enter in a minute book a record of topics discussed and decisions made at the meeting," which shall be kept confidential]; *Kunec v. Brea Redevelopment Agency, supra*, 55 Cal.App.4th at p. 523, fn. 6 [acknowledging but not reaching issue of how local agency must satisfy statutory requirement that disclosure of disqualifying conflict of interest "be contained in an 'official public record' and that it describe 'with particularity' the 'nature of the financial interest' "].)

 City's argument ultimately does not rest on statutory language at all but on a body of case law developed in an entirely different context, and only secondarily applicable here, concerning the admissibility of evidence of the *subjective motives* and *mental processes* of local legislators. City writes in its brief that Bank was not entitled to " 'look[] beyond [the] minutes to see what the intention of the Council was,' " because " 'It is well established that a court determines the validity of legislative enactments based on the facial content or effect of the enactment, not by examining the subjective motives or purposes of the legislators.' (*Schroeder v. Irvine City Council* [(2002)] 97 Cal.App.4th [174,] 192–193 [118 Cal.Rptr.2d 330].) Courts will not permit testimony from current or former public officials concerning their intentions or understandings of legislative actions. (See *County of Los Angeles v. Superior Court, supra*, 13 Cal.3d at pp. 731–732; *City of Santa Cruz v. Superior Court, supra*, 40 Cal.App.4th at p. 1148; *Schroeder v. Irvine City Council, supra*, 97 Cal.App.4th [at p.] 192–193; *Board of Supervisors v. Superior Court* [(1995)] 32 Cal.App.4th [1616,] 1624 [38 Cal.Rptr.2d 876].)" (Fn. omitted.)

From these authorities City has extracted a kind of legislative parol evidence rule that would, apparently, bar *any* extrinsic evidence (i.e., evidence outside the minutes) to determine what a local government did, or meant to do, when it cast a particular vote. But as plainly appears from the very quotation City chose as its frontispiece, the cases cited by it are concerned with challenges to "the *validity* of legislative enactments" based on "the *subjective motives or purposes* of the legislators. [Citations.]" (*Schroeder v. Irvine City Council, supra*, 97 Cal.App.4th at pp. 192–193,

italics added.) In other words, these cases stand for the rule that *facially valid* legislative acts cannot ordinarily be *impeached* based on the *mental processes* of individual legislators.

The basis for this rule is obvious. Courts would grossly overstep their constitutional bounds if they assumed a general power to invalidate facially unobjectionable legislation based upon what they found to be impermissible motives or other flaws in the mental processes of legislators. Every case cited by City on this point involves an attempt to impeach a facially proper enactment in just this way. (See *Schroeder v. Irvine City Council, supra,* 97 Cal.App.4th 174 [trial court properly granted special motion to strike complaint alleging that facially valid voter registration program was motivated by city council's support for a particular ballot proposition; no error in preventing plaintiff from questioning legislators concerning their reasons for voting for measure]; *County of Los Angeles v. Superior Court, supra,* 13 Cal.3d at p. 723 [challenge to municipal salary ordinance on ground that it had been adopted "as a result of a threatened illegal strike by public employees"; order directing legislators to "disclose portions of discussions in which they participated prior to the enactment" of the ordinance "violate[d] a longstanding legal principle precluding judicial inquiry into the motivation or mental processes of legislators in enacting legislation"]; *id.* at p. 729 [assuming claimed ulterior motive is relevant to validity of ordinance, "the taxpayer still may not prove such ulterior purpose by requiring legislators to testify about their reasoning process or by questioning others about the factors which may have led to the legislators' votes"]; *City of Santa Cruz v. Superior Court, supra,* 40 Cal.App.4th at p. 1148 [reversing discovery order directing members of a planning commission to answer deposition questions concerning " 'whether there was an agreement among the council and commission members to refuse to consider any zoning for the greenbelt properties other than agricultural, regardless of the facts or evidence presented' "]; *Board of Supervisors v. Superior Court, supra,* 32 Cal.App.4th at p. 1619 [rejecting attempt to obtain discovery intended to determine whether board of supervisors "ignored, or even considered" vote of judges which board was required by statute to take "into advisement"].)

■ These cases operate here to limit the scope of discovery and the admissibility of certain types of testimony and evidence. They may well be implicated by Bank's suggestion that the Council/Board might have deliberately kept the public record vague in order to avoid certain collateral consequences.[20] But whatever their potential application to specific discovery

---

[20] Counsel for Bank alluded below to indications that City had deliberately kept its records vague "around the issue of how this was going to be collateralized," because officials "didn't want this to be determined by the Department of Industrial Relations to be a public project," presumably because such a determination would subject the project to prevailing wage laws,

requests and proffers of evidence, these cases do *not* support a categorical rule against looking beyond the minutes of local agency action to ascertain the meaning and intent of a patently ambiguous enactment. On the contrary, where the issue is not the beliefs and motives of individual members but the *collective intent of the Legislature*, as objectively manifested in the adoption of particular measures, courts may and must consult extrinsic evidence including circumstances and information known to the Legislature at the time of the enactment, public records of their collective deliberations, and expressions of intent collectively adopted by them. It is true that California law may prevent individual legislators from saying what they privately believed a measure would do, even if a majority of them are prepared to so testify. But nothing in California law prevents discovery and evidence of what legislators *said* about a proposal before them *in the presence of the body*, even if their statements can be conceived as reflecting a mental state or process, provided the evidence is offered to show *what the body was voting on when it adopted the measure.*

■ These principles have been recognized both in and out of California. In *Carruth, supra*, 233 Cal.App.2d 688, the plaintiff sought to prove that, in approving a subdivision map some 17 years before the action was filed, the defendant city council had agreed to install water and sewer mains to serve the subdivision. The minutes of the relevant meetings "reflect[ed] no formal council action . . . other than approval of the subdivision map." (*Id.* at p. 691.) Over the city's objection, the developer presented "parol proof of the agreement," consisting mainly of testimony by the mayor and the developer. (*Id.* at p. 692.) The city charged on appeal that this was error, and that "since the minutes of the city council do not reflect that city and Rogers entered into an agreement, there is no enforceable contract." (*Ibid.*) The court distinguished the city's authorities, however, on the ground that they were "premised upon charter provisions or general laws prohibiting municipalities from entering into contracts other than by ordinance or by *resolution duly recorded in council records.*" (*Ibid.*, italics added.) In the absence of a specific requirement to that effect, the case fell within the general rule that while parol evidence may not be admissible to *vary* the terms of municipal enactments, authorities, it was allowed " 'to establish the real facts of transactions or

---

increasing its cost. (See Lab. Code, §§ 1771, 1720.) We cannot say that even evidence such as this is categorically inadmissible. It is conceivable, for instance, that City might open the door to similar evidence were it to present evidence to the opposite effect, e.g., by calling a City official or Council member to testify that diligent efforts were made to keep the minutes as explicit and specific as possible. More broadly it might be suggested that the deliberative privilege should give way when a municipal government seeks to use the privilege as a sword to escape the effects of its own legislative acts rather than as a shield against their invalidation. We need not address that hypothesis in this appeal. At least in the absence of extraordinary circumstances not presently appearing here, the question "What were you thinking when you voted?" is probably one that cannot be asked.

corporate acts, in the entire absence of all record, or where the record kept is so meager that the particular transaction, act, or vote is not disclosed by it.' " (*Ibid.*, quoting 5 McQuillin, Municipal Corporations, § 14.08, pp. 27–28; see now 5 McQuillin, The Law of Municipal Corporations (3d ed. 2004) Municipal Records, § 14.9, pp. 27–29.) ▉ The court held that Government Code section 36814 is "directory only," that it is "not conclusive as to the proceedings of a city council," that "it does not restrict proof of contracts to the minutes of the council meetings," and that it does not "prevent the introduction of evidence that the minutes do not reflect all of the proceedings of the council." (*Carruth, supra*, at p. 693.) The court also rejected the contention that the completeness of the minutes was conclusively established by the presumption that official duty has been regularly performed, noting that the presumption was disputable and that substantial evidence supported the trial court's finding that the presumption had been overcome.[21] (*Ibid.*, citing former Code Civ. Proc., § 1963, subds. 15, 20, 33; see now Evid. Code, § 664; Civ. Code, § 3548; see also *Gordon v. City of San Diego* (1895) 108 Cal. 264, 269 [41 P. 301] [challenge to city's sale of land based on absence of official record; "parol evidence is admissible to prove facts omitted from the record unless the law expressly and imperatively requires all matters to appear of record, and makes the record the only evidence"].)

The court below found *Carruth* inapplicable for three reasons, the first of which was that it involved a legislative act that was "reflected in official minutes and the only issue was which conditions attached" to the act, whereas here the court found "no authorization in any City or CDA minutes for a pledge of public funds . . . ." But what the minutes before us show is the approval of a loan to TSP. The minutes do not specify who will make the loan or by what mechanisms. The staff reports apparently before the local body when it voted stated that the loan might be made directly to TSP or that the funds to be authorized might be applied to "capitalize" a loan by a third party. The court below apparently dismissed the reference to "capitalizing" on a lexicographical argument, which we find unsound.[22]

---

[21] Here Bank can cite the presumption of regularity in its own support by bringing it to bear on the conduct of the treasurer and mayor in depositing and pledging the funds in question.

[22] The court remarked that "capital is defined in Black's Law Dictionary very differently than collateral or pledge." When dealing with ambiguous legislation, however, the central question is not what a parsing of the dictionary may yield but what the Legislature intended. Further, the court's remark indicates that it looked up the wrong terms, i.e., noun cognates of the verbs actually at issue. As potentially applicable in a financial context, "capitalize" means either "to convert [an asset] into capital," or "to supply capital for" an undertaking, investment, or venture. (Merriam-Webster's Collegiate Dict. (10th ed. 1999) p. 169; cf. Black's Law Dict. (8th ed. 2004) p. 223 [defining "capitalize" as "1. To convert (earnings) into capital. 2. To treat (a cost) as a capital expenditure rather than an ordinary and necessary expense. 3. To determine the present value of (long-term income). 4. To supply capital for (a business)."]) While we do not decide the issue, the present record presents no basis to understand the term "capitalize," as

The court also found *Carruth* inapposite because it was based upon "the lack of a statutory requirement that City contracts be set forth in official minutes," whereas here "specific statutes require a recorded vote of the City Council prior to commitment of City funds (Gov. Code, §§ 36935, 36936)." As we have concluded, however, the cited statutes do not purport to prescribe the degree of specificity with which the terms of a spending measure must be set down in the minutes. Nor can we accept the court's suggestion that *Carruth* is no longer good law in light of *County of Los Angeles v. Superior Court, supra*, 13 Cal.3d 721, which, the court concluded, "clearly prohibits the testimony Bank seeks to introduce." As we have held, that case and related authorities are concerned not with the degree of specificity with which municipal enactments must be set out in the official minutes but with the admissibility of evidence of individual legislator's subjective motives and mental processes to impeach an otherwise valid enactment.

██ The general law governing admissibility of extrinsic evidence in the construction of municipal enactments remains essentially what it was when *Carruth* was decided. As a starting principle, minutes of local government meetings should "[g]enerally . . . be full and accurate." (5 McQuillin, *supra*, § 14.3, p. 10, fn. omitted.) To the extent that a municipal corporation is "required to keep a record of its proceedings," as by a statute, evidence of its proceedings, and of actions taken in them, must ordinarily be found in "municipal records properly authenticated or verified." (5 McQuillin, *supra*, § 14:6, p. 17.) It is also generally true that "evidence will not be received in a collateral action to vary or contradict" a municipal record that is "regular and complete on its face." (*Id.* at p. 19, fn. omitted.)

██ However, "[o]mission to make a record of municipal proceedings, or to keep such a record, does not per se invalidate municipal action that is otherwise valid. Ordinarily the validity of an ordinance or resolution is not affected by the fact that, through an oversight of the clerk, it is not copied on

---

used in the staff reports here, to convey any meaning other than the last one, i.e., *to supply capital for*. So viewed, the staff report is easily understood to propose that the City/Agency will appropriate funds to be used either to lend money directly to TSP or to supply capital to a third party to make the loan to TSP. It has not been suggested that this statement of the proposal in the alternative is itself fatal. Nor does the present record provide any reason to doubt that the hypothetical authorization to supply capital was intended to be broad enough to encompass a pledge as distinct from some other mechanism. The fact that officers of the City/Agency proceeded to enter into precisely such a transaction, and that the Council/Board thereafter authorized a further similar expenditure, would seem to provide additional evidence that this is what Council/Board members intended. No alternative construction has ever been offered by City. While we do not wish to foreclose any showing or argument City may be able to make on this point, the court's reliance on inapposite dictionary entries is not sufficient to support a determination that the staff reports fail to propose authorization for a pledge of funds as an alternative to a direct loan.

the municipal records. While the decisions present some apparent conflict respecting collateral impeachment of records of public or quasi-public corporations which are required by express law to be kept in writing, they are reasonably uniform in admitting parol evidence to establish the real facts of transactions or corporate acts, in the entire absence of all record, or where the record kept is so meager that the particular transaction, act, or vote is not disclosed by it. *The unrecorded acts of the council, if clearly proved, are valid.* This principle has been adopted in order to preserve the rights of creditors of the corporation or third persons who have performed work or services or expended money for the benefit of the corporation, relying in good faith on the regularity and legality of the proceedings. It has also been invoked in other instances." (5 McQuillin, *supra,* § 14.9, pp. 27–29, fns. omitted, italics added.)[23]

The cases cited by City do not purport to alter or depart from these principles, and are readily harmonized with them. At most, they *circumscribe* the *kinds* of evidence that may be admitted to establish the meaning of municipal legislation. Admissible evidence clearly includes "[d]uly authenticated reports of committees and officers," at least where the record otherwise shows that the report was adopted by the members or acted upon by them. (See 5 McQuillin, *supra,* § 14:7, p. 22.) In addition, and perhaps critically here, *tape recordings* of the relevant proceedings, if duly authenticated, may be part of the public record and, as such, admissible to establish the nature and intent of legislative action. (See 5 McQuillin, *supra,* § 14:3, p. 10, fn. omitted ["Audiotape minutes may or may not be sufficient to meet the requirements for keeping full and accurate minutes"]; 64 Ops.Cal.Atty.Gen. 317 (1981) [tape recordings of city council meetings by public officer or employee are public records to which public has right of access and copies].)[24] The paramount question is what was the sense of the legislative body as inferred from the public record of, and the circumstances surround-

---

[23] Moreover, "courts will not require the same exactness in keeping the records of a town as in the case of court records. . . . [I]n keeping records of councils of small cities and towns the same exactness is not required as in the more important urban centers, because usually such records are kept by inexperienced persons." (5 McQuillin, *supra,* § 4.3, at pp. 9–10, fns. omitted.)

[24] Here audio recordings of the proceedings were apparently made and provided to Bank, but the court excluded transcripts of them as hearsay and, apparently, as violating the supposed "rule" against extrinsic evidence. The record does not support either objection (see *Zuckerman v. Pacific Savings Bank* (1986) 187 Cal.App.3d 1394, 1404, fn. 2 [232 Cal.Rptr. 458]), and if the recordings and transcripts are duly authenticated—a question the court did not reach—they may well be admissible to illuminate the ambiguous minute entries. (See *El Dorado Palm Springs, Ltd. v. City of Palm Springs* (2002) 96 Cal.App.4th 1153, 1175–1176 [118 Cal.Rptr.2d 15] [relying on transcript of earlier city council meeting to reject litigant's contention that formal resolution at a later meeting constituted untimely determination and thus a grant of litigant's application by operation of law].)

ing, the adoption of the measure. So long as evidence goes to this point and not to what an individual legislator wanted or believed, the evidence is material and, if not barred by some other rule of evidence, admissible.

 It can hardly be doubted that the measures at issue here, as set down in the minutes reflecting their adoption, were ambiguous. Indeed they can hardly be understood *at all* without consulting the meeting agendas, which in turn refer to staff reports summarizing the proposed actions and their effects. Among the points left unclear by the materials before the court were (1) what entity's funds were being loaned, and (2) whether the legislators intended to authorize a hypothecation of those funds as an alternative to a direct loan to the developer. Bank was entitled to adduce evidence bearing on these questions, including statements made or information otherwise conveyed to the Council about the reason and need for the measures, the circumstances giving rise to them, and their probable or desired effects. Again, it was the City's burden to show that there was no authorization by the relevant entity for the transaction that actually took place. The court could not find that the City had carried that burden without determining the precise nature of the transaction that occurred (including the entity or entities on whose behalf it was executed), *examining the whole* of the public record as it related to that transaction, and weighing the admissible circumstantial evidence insofar as it bore on the issues. In the absence of such a thorough assessment, the Bank could not be found to have been under a "clear" duty, or indeed any duty, to return the funds at issue.

### B. *Unlawful Gift of Public Funds*

As an alternative ground for relief the court found that the pledge of the deposit amounted to an unlawful gift of public funds. This conclusion explicitly depended on the court's determination that there was no valid legislative act authorizing the pledge; thus the court wrote, "Without proper authorization and findings, the Assignment also constitutes an illegal gift of public funds. (Cal. Const., article XVI, § 6.)" This conclusion therefore falls with the court's conclusion that there was not "proper authorization." The record presents far too many factual uncertainties to permit a determination on this appeal that these transactions violated the cited constitutional provision.

The trial court and City have alluded to numerous other potential impediments to the Bank's position. All of these points will be open to proof, under appropriate pleadings, on remand.

## Disposition

In No. H026888, the judgment is reversed with directions to deem Bank's demurrer to the petition a motion to strike all allegations alleging a right to, or praying for, a writ of mandate, and to grant said motion with leave to amend. In No. H027166, the order awarding attorney fees is reversed. Appellant Bank will recover its costs on appeal.[25]

Premo, J., and Elia, J., concurred.

A petition for a rehearing was denied September 1, 2005, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied November 16, 2005.

---

[25] This disposition renders moot Bank's request for or judicial notice, which we deny on that basis.